**Carol L. ALDERMAN, Plaintiff,**

v.

**INMAR ENTERPRISES, INC. and CAROLINA COUPON CLEAR-ING, INC., Defendants.**

No. 1:00CV1204.

United States District Court, M.D. North Carolina.

March 8, 2002.

David C. Pishko, Rachel Katherine Esposito, Elliot Pishko Gelbin & Morgan, P.A., Winston–Salem, NC, for Plaintiff.

Richard Lee Rainey, Womble Carlyle Sandridge & Rice, PLLC, Charlotte, NC, for Defendants.

## *MEMORANDUM OPINION*

BEATY, District Judge.

## I. INTRODUCTION

This matter is currently before the Court on Defendant Inmar Enterprises, Inc. and Defendant Carolina Coupon Clearing, Inc.'s (collectively, "Defendants") Motion for Summary Judgment [Document # 14] as to Plaintiff's claim of age discrimination pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (the "ADEA") and Plaintiff's claim of wrongful termination in violation of North Carolina public policy. Defendants also seek summary judgment in their favor on their North Carolina state

law counterclaim for conversion. For the reasons explained below, Defendants' Motion for Summary Judgment is GRANTED IN PART to the extent that there is no genuine issue of material fact as to either of Plaintiff's claims against Defendants. As a result, all claims against Defendants are hereby DISMISSED. For the reasons explained below, Defendants' Motion for Summary Judgment is DENIED IN PART to the extent that there is a genuine issue of material fact as to Defendants' counterclaim for conversion. Furthermore, because the Court declines to exercise supplemental jurisdiction over Defendants' counterclaim for conversion, Defendants' counterclaim is hereby DISMISSED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The documents available to the Court indicate that Defendant Carolina Coupon Clearing, Inc. ("CCC") is a wholly owned subsidiary of Defendant Inmar Enterprises, Inc., and is a business that processes coupons for retail and wholesale clients. In January, 1993, Plaintiff Carol L. Alderman ("Plaintiff") was employed as a primary account sales executive for CCC.[1] In that position, Plaintiff was responsible for managing and processing coupons for various grocery store, drug store, and wholesale clients. Plaintiff maintains that throughout her employment she met her employer's expectations, and even exceeded expectations in the area of client services. In support of her position, Plaintiff notes that she allegedly received multiple raises and claims that her attendance record was good. Furthermore, Plaintiff argues that she was a dedicated and valuable employee, noting that she was, at times,

chosen to represent Defendants at trade shows and client meetings.

Defendants, on the other hand, paint a different picture regarding Plaintiff's work performance. In September, 1993, within the first year of her employment with CCC, Defendants note that Plaintiff was placed on a performance improvement plan, targeted at bettering Plaintiff's client responsiveness and follow-up practices, her communication skills, and her general job knowledge. (Alderman Dep., at 25.) Notably, on October 15, 1993, Plaintiff's performance improvement plan was extended an additional thirty days. After noting Plaintiff's 1993 performance improvement plan, Defendants further claim that Plaintiff consistently received performance reviews rating her overall performance as "marginally meeting job expectations" and needing to improve in the areas of "planning and organization, and spending less time on personal matters." (Br. Supp. Def.'s Mot. Summ. J., at 2.) Defendants also claim that in December, 1997, an "areas of concern" memorandum was issued to Plaintiff. According to Defendants, the memorandum alerted Plaintiff to deficiencies in a number of areas, including "timely completion of account profiles, excessive personal phone calls, and inappropriate priorities." (Id.) Despite this notification, Defendants claim that Plaintiff continued to exhibit poor organization and time management skills, and spent too much time dealing with personal matters while at work.

According to Plaintiff, sometime in 1998, CCC began to terminate or force the resignation of many senior employees in favor of younger replacements. In support of this assertion, Plaintiff claims that, during 1998 and 1999, five new management-level

---

**1.** Primary accounts are defined by the parties as those with less than five million coupons

processed per year.

employees, all in their twenties and thirties, were hired to fill the gap left by the demotion, termination, or resignation of five employees over the age of forty. Plaintiff included herself as one of the five individuals who were terminated, only to be replaced by younger workers. In short, Plaintiff argues that this alleged transition from older to younger employees serves as evidence that Defendants discriminated on the basis of age in violation of the ADEA.

Of course, Defendants offer a different explanation for their employment decisions. With respect to Plaintiff, Defendants argue that she was not meeting their legitimate expectations. In fact, according to Defendants, Plaintiff's July, 1999 midyear performance review indicated a number of areas in which Plaintiff needed improvement. The review specifically noted that Plaintiff had failed to meet the expectations established for her in January 1999.[2] Furthermore, Plaintiff had failed to successfully complete her e-PS[3] certification, which, at the time, was required of all account executives, including Plaintiff.[4]

According to Defendants, on August 16, 1999, Plaintiff, because of concerns related to her job performance, was given the option of either resigning with a severance package or being placed on another performance improvement plan. Plaintiff chose to remain with CCC and accepted the performance improvement plan. According to Defendants, the purpose of the plan was to ensure that Plaintiff "clearly understood the performance areas that needed her attention and to set clear job expectations for her" to pursue. (*Id.*, at 3.) An integral part of the performance improvement plan required Plaintiff to complete and pass all phases of her e-PS certification by August 31, 1999. The certification process included a written exam and two oral presentations. Although the e-PS certification requirement was originally made known to Plaintiff in February, 1999, by the August 31, 1999 deadline she had, according to Defendants, only passed the written test.

Plaintiff originally attempted the first phase of the oral presentation in April, 1999 and failed. Although the performance improvement plan clearly indicated that the e-PS certification had to be com-

---

2. In response to Defendants' claim that Plaintiff failed to meet certain expectations, Plaintiff argues that she received her Review for the last portion of 1998 not in January, 1999, as scheduled, but in May, 1999. Plaintiff claims that this review, which identified many of her job expectations, was turned in too late, leaving her with less than two months before her July, 1999 evaluation.

According to Defendants, the review was late, as were many other performance reviews, because the early portion of 1998 was an unusually busy time for CCC, and many administrative duties were delayed in order to make time for other priorities. While Plaintiff's performance review may have been provided to her later than perhaps desired, the Court notes that many of the expectations included in the review, such as limiting personal phone time and strengthening client relationships, were goals that had been identi-

fied in prior reviews and conferences as problem areas that needed Plaintiff's attention. Therefore, Plaintiff cannot now claim that she had insufficient notice of the expectations included in her May, 1999 performance review.

3. e-PS is an electronic promotion service, administered by Defendants, to assist retailers in obtaining reimbursements for electronically cleared promotions. These promotions include price reductions offered by many large grocery store chains to holders of frequent customer cards. A common example, and the example given by Plaintiff, is the Harris Teeter *VIC* card.

4. As indicated by Plaintiff, Defendants no longer require all account executives to obtain e-PS certification. The requirement was eliminated, according to Defendants, because they secured a team of product experts that specialize in the provision of e-PS services.

pleted by August 31, 1999, Plaintiff did not make her second attempt to pass the first phase of the oral presentation until August 30, 1999. Plaintiff was again unsuccessful. Therefore, the following day, August 31, 1999, Defendants terminated Plaintiff's employment. Defendants stated reason for Plaintiff's termination was that she failed to secure her e-PS certification as required under the performance improvement plan and failed to satisfy several planning and organizational goals that had been set for her.

At the time of her termination Plaintiff was offered a severance package in exchange for a signed release of all potential claims against Defendants. Plaintiff executed the release agreement, which provided for a seven-day revocation period. During this seven-day period, Plaintiff provided Defendants with written notice of her intent to revoke the release. Defendants, however, mistakenly paid Plaintiff $11,559.97, which was the amount she would have been due had the release not been revoked. When Defendants realized their mistake, they sent Plaintiff two separate letters requesting that she surrender the funds that had been mistakenly paid to her. According to Defendants, Plaintiff did not respond to these requests. A third request was sent to Plaintiff's attorney after she filed her discrimination charge with the Equal Employment Opportunity Commission; this request was likewise met with no response. Notably, at her deposition, Plaintiff admitted that she knew the money had been improperly paid to her and that she made no effort to repay the funds because they had already been spent. (Pl.'s Dep., at 113–18.)

On November 28, 2000, Plaintiff filed the instant lawsuit, alleging a federal claim for age discrimination pursuant to the ADEA and a state law claim for wrongful discharge in violation of North Carolina public policy. Defendants responded to Plaintiff's allegations by answering the Complaint and asserting a counterclaim for conversion based on Plaintiff's failure to repay the money that was mistakenly paid to her. Formal discovery ended on November 15, 2001. Thereafter, on December 14, 2001, Defendants filed a Motion for Summary Judgment [Document # 14] seeking dismissal of Plaintiff's claims and judgment on their counterclaim. This matter is therefore currently before the Court on Defendants' Motion for Summary Judgment with respect to Plaintiff's claims as well as Defendants' counterclaim.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary Judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court is not "'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting *Schuylkill & Dauphin Imp Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1871)). In considering a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party, in this case, Plaintiff, and accord that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield,* 67 F.3d 53, 56 (4th Cir.1995), *cert. denied,* 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Moreover, the Court should not grant a motion for summary judgment "'unless the entire record shows a right to judgment with such clarity as to leave no

room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs.,* 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.,* 381 F.2d 245, 249 (4th Cir. 1967)). Nevertheless, a mere scintilla of evidence is insufficient to withstand a motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202. There must be evidence "on which the jury could reasonably find for the plaintiff." *Id.* With this standard in mind, the Court must evaluate the merits of Plaintiff's claims to determine whether summary judgment in favor of Defendants is proper.

**B. Defendants' Motion for Summary Judgment**

**1. Plaintiff's First Claim for Relief; the ADEA**

Defendants have moved for summary judgment with respect to Plaintiff's First Claim for Relief under the ADEA. The ADEA provides, in pertinent part, that it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age .... " 29 U.S.C. § 623(a)(1). The ADEA further provides that its prohibitions serve to protect only those individuals who are at least forty years of age. 29 U.S.C. § 631(a). The Fourth Circuit recognizes two methods by which a plaintiff can establish a violation of the ADEA. *Burns v. AAF–McQuay, Inc.,* 96 F.3d 728, 731 (4th Cir.1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1247, 137 L.Ed.2d 329 (1997). A plaintiff can establish his case through any direct or indirect evidence that is probative of the issue of age discrimination. *Id.*

Alternatively, a plaintiff can rely on the judicially created scheme of proof originally established for use in Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later adapted for use in the context of age discrimination under the ADEA. *Burns,* 96 F.3d at 731; *E.E.O.C. v. W. Elec. Co.,* 713 F.2d 1011, 1014 (4th Cir.1983). In the instant case, Plaintiff claims that she satisfies both of the two recognized methods. The Court will therefore address the merits of Plaintiff's ADEA claim with respect to each of the two methods of proof, beginning with proof by means of direct or indirect evidence.

**a. Plaintiff's Direct/Indirect Evidence of Age Discrimination**

When offering proof of direct or indirect evidence to establish age discrimination, a plaintiff is not required to prove that age was the sole basis for the employer's decision. Rather, the plaintiff must simply demonstrate that age was a consideration, or a motivating factor, in the decision to take adverse employment action against the plaintiff. *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991). In this case, Plaintiff alleges that she can satisfy this burden through proof of direct evidence of age discrimination. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J., at 12.) In support of this claim, Plaintiff provides two examples of what she alleges amount to direct evidence of age discrimination.

■ Plaintiff's first example includes a computation of data and states that "[o]ut of approximately thirty employees, defendants either terminated or enabled the forced resignations of five of their most experienced workers within a year and a half, from November of 1998 until April of 2000." (*Id.,* at 13.) Plaintiff further indicates that a sixth employee was demoted because of her age. Plaintiff contrasts these numbers by claiming that only one

employee below the protected age of forty suffered adverse employment action during the relevant time period. (*Id.*) Therefore, Plaintiff essentially argues that of the seven employees who faced adverse employment action during the relevant time period, six were within the protected age group. Moreover, according to Plaintiff, "[m]ost of the new hires . . . were in their twenties and thirties." (*Id.*) Plaintiff claims, then, that this alleged "pattern" of replacing older employees with younger workers "is sufficient to prove . . . [D]efendants' unlawful motive for terminating . . . [P]laintiff." (*Id.*)

With respect to Plaintiff's first example of direct evidence of discrimination, that is, Plaintiff's statistical evidence, the Court notes that because such statistics can be easily manipulated, they must be carefully scrutinized. *Vaughan v. Metrahealth Cos., Inc.*, 145 F.3d 197, 203 (4th Cir.1998). The Court will therefore closely examine Plaintiff's statistical data. Taken in the light most favorable to Plaintiff, her evidence alleges that six out of seven employees that faced adverse employment action during the time period at issue were above the age of forty.[5] Notably, Plaintiff's evidence is drawn from a sample of only seven employees.[6] The Fourth Circuit has determined, however, that a sample size of seven is too small to be probative of discrimination.[7] *Id.* (noting that the statistics offered were particularly unhelpful, as they were "drawn from a sample of seven employees, which is too small for reliable analysis"). Furthermore, Plaintiff has failed to include a standard deviation or hypothesis testing analysis as required by the Fourth Circuit. *Moultrie v. Martin*, 690 F.2d 1078, 1083 (4th Cir.1982); *see also W. Elec. Co.*, 713 F.2d at 1018 (4th Cir.1983) (requiring hypothesis testing). Such analyses would reflect the reliability of the statistical data and are particularly

5. Specifically, Plaintiff indicates that Mr. Russ Decker, Ms. Joy Adams, Ms. Diana Veach, Ms. Robin Martinez, and Plaintiff herself were all above the age of forty and were allegedly either terminated or forced to resign. In addition, Plaintiff claims that Ms. Connie Jones, also over the age of forty, was demoted on the basis of her age. According to Plaintiff, the only individual under age forty that was terminated during the relevant time frame was Ms. Cynthia Dinkins.

6. The sample size reflects the total number of individuals that faced adverse employment action during the relevant time period. *See Vaughan*, 145 F.3d at 203. A pattern of discrimination can be shown when, out of the total number of employees that faced adverse employment action, a disproportionate number of them were within the protected age group. *See generally id.* (considering the plaintiff's claim that out of the seven individuals that were terminated, six of them were over the age of forty).

7. The circumstances in *Vaughan* were remarkably similar to those in the current case in that *Vaughan* also involved an allegation that seven employees were terminated, with six of them being over the age of forty. *Vaughan*, 145 F.3d at 203. The Fourth Circuit clearly indicated, though, that the sample size of seven was too small to be probative of discrimination.

Of course, where a sample is small simply because the employer maintains a small workforce, it cannot fairly be said that its small size renders the sample unrepresentative. *U.S. v. Gregory*, 871 F.2d 1239, 1245 n. 24 (1989), *cert. denied*, 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990) ("[T]he small number of . . . employees making up the data base cannot be seen as establishing statistical insignificance because it comprises the entire universe of available positions and does *not* merely constitute an unrepresentative sample."). In the instant case, however, Plaintiff cannot point to *Gregory* and argue that her statistical data should be considered by the Court due to the small size of CCC's workforce, as the record indicates that on January 10, 2000, shortly after Plaintiff's termination, CCC employed more than forty individuals. (CCC Organizational Chart, Exs. in Opp'n to Defs.' Mot. Summ. J., Ex. # 2.)

helpful when interpreting data drawn from a small sample, as "the precision and dependability of statistics is directly related to the size of the sample being evaluated." *Moultrie*, 690 F.2d at 1083. Therefore, because Plaintiff's sample is too small to be considered reliable and does not include the requisite standard deviation analysis, this Court finds that Plaintiff's statistical data is insufficient to serve as direct evidence of age discrimination by Defendants.

The Court further notes that even if Plaintiff's data was considered statistically reliable, the depositions of both Ms. Diana Veach and Mr. Russ Decker reveal weaknesses in Plaintiff's claim that Defendants operated under a pattern of discrimination. When asked in their depositions whether they were the victims of age discrimination, Ms. Veach and Mr. Decker both indicated that they were not and had resigned voluntarily. (Veach Dep., at 47; Decker Dep., at 28.) In fact, according to Defendants, of the five individuals that left Defendants' employ, Plaintiff was the only one that was involuntarily terminated; the others each resigned on their own accord. (Defs.' Reply Br., at 2.) There is no reliable indication in the record that any of the individuals felt pressure to resign due to their respective ages.[8] In light of the information included in the record, and the fact that Plaintiff's data is inherently unreliable due to both the small sample size and Plaintiff's failure to include a standard deviation analysis, the Court finds that Plaintiff's data is not sufficient to demonstrate a pattern of discrimination and therefore does not amount to direct evidence of discrimination.

■ Plaintiff's second example of direct evidence of age discrimination concerns a comment made by former CCC president Mike Marino during his farewell speech in December, 1999. Specifically, Plaintiff quotes Mr. Marino as saying that he was leaving behind a "younger organization." (Pl.'s Br. Opp'n Defs.' Mot. Summ. J., at 14.) Plaintiff alleges that Mr. Marino's statement "confirm[s] ... [D]efendants' plan to rid themselves of older sales people ...." (*Id.*) With respect to Plaintiff's second example of direct evidence of discrimination, the Court is likewise not persuaded. In order to serve as evidence of discrimination, there must be some nexus between the alleged discriminatory statement and the employment decision at issue. *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 942–43 (4th Cir.1992); *see also Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511–12 (4th Cir.), *cert. denied*, 513 U.S. 1058, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994) (finding that an alleged discriminatory statement was too remote to serve as evidence of age discrimination). As noted previously, Mr. Marino was an outgoing president delivering his farewell speech at the time the alleged discriminatory statement was made. Mr. Marino's statement simply has not been linked to Defendants' decision to terminate Plaintiff. This is especially evident in light of the fact that there is no evidence presented

---

**8.** Plaintiff has submitted affidavits from two of the five terminated employees suggesting that age was a factor in the employment action taken by Defendants. These affidavits, however, plainly contradict prior deposition testimony in which the two individuals claimed that they held no perception that age was a factor in Defendants' employment decisions. Because of this contradiction, Plaintiff cannot demonstrate that the affidavits are reliable. *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 976 (4th Cir.1990) (holding that the district court was justified in disregarding an affidavit when it conflicted with prior deposition testimony); *see also Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

that Mr. Marino was involved in the decision to end Plaintiff's employment.

■ Moreover, the Court notes that with respect to Mr. Marino's statement, an isolated or ambiguous comment generally does not rise to a level sufficient to evidence a pattern of discrimination. *See, e.g., Cone v. Longmont United Hosp. Assoc.,* 14 F.3d 526, 531 (10th Cir.1994); *Phelps v. Yale Sec., Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.), *cert. denied,* 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993). A single observation that the work force is younger than in the past is too isolated and ambiguous to indicate a plan on behalf of Defendants to discriminate against Plaintiff, or any other identified employee, on the basis of age.

Nevertheless, Plaintiff relies on *Kirsch v. Fleet St., Ltd.,* 148 F.3d 149 (2d Cir. 1998), for the proposition that such statements may be evidence of discrimination on the part of the employer. Plaintiff's reliance on *Kirsch,* however, must be closely examined because the circumstances in *Kirsch* were much different than in the instant case. First of all, *Kirsch* involved more than a single allegedly discriminatory statement. *Id.,* 148 F.3d at 162–63. Additionally, the statements made in *Kirsch* were much more egregious than the single statement made by Mr. Marino. For example, one of the statements made in *Kirsch* involved a direct threat to an older employee that he should beware because all the other employees working around him were much younger. *Id.* at 163. There was also a statement made by a company supervisor during an interview that the company at issue in *Kirsch* was seeking to hire new, younger employees. The court in *Kirsch* felt that the context in which this statement was made reflected an "official company position" to hire younger candidates. *Id.* Of course, in the instant case, Plaintiff

has only offered evidence that a single statement was made. Mr. Marino's statement was not directed at any particular individual and was not made in a context under which it could have been perceived as an official company position. It was simply an observation made by the outgoing president, and not a "directive to create a younger sales and services division," as posited by Plaintiff. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J., at 14.) Therefore, despite Plaintiff's reliance on *Kirsch,* this Court finds that Mr. Marino's observation that he was leaving behind a "younger organization" was an isolated comment that cannot be attributed to Defendants in the form of direct evidence of age discrimination.

In sum, this Court notes that Plaintiff's statistical data, because of the deficiencies discussed above, does not amount to direct evidence of discrimination. Similarly, Plaintiff's assertion that Mr. Marino's statement amounts to a directive to discriminate on the basis of age does not rise to the level of direct evidence of age discrimination. Plaintiff has therefore failed to establish discrimination, or an inference thereof, through the use of direct evidence. As such, this Court finds that Plaintiff's attempt to establish her ADEA claim through the use of direct evidence fails.

### b. Plaintiff's Prima Facie Case/*McDonnell Douglas* Analysis

Even though Plaintiff has failed to establish a claim for age discrimination through the use of direct evidence, she may still attempt to prove her ADEA claim by way of the *McDonnell Douglas* scheme. *Burns v. AAF–McQuay, Inc.,* 96 F.3d at 731 (stating that the *McDonnell Douglas* analysis, originally used in Title VII cases, is appropriate in the context of an ADEA claim); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973). That scheme requires that Plaintiff prove, by a preponderance of the evidence, a prima facie case of discrimination. *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir.2000). To prove her prima facie case, Plaintiff must establish the following four basic elements:

1) that she is a member of the protected age group, that is, at least forty years of age.;

2) that she was discharged or demoted from her job;

3) that she was performing her job at a level that met her employer's legitimate expectations; and

4) following her termination, she was replaced by a substantially younger employee.[9]

*Burns*, 96 F.3d at 731.

Once Plaintiff has established her prima facie case, Defendants must respond with evidence that they acted with a legitimate, nondiscriminatory purpose. *Stokes*, 206 F.3d at 429. If Defendants meet this burden of production, the presumption of discrimination created by the prima facie case vanishes, requiring Plaintiff to prove that Defendants' proffered reason is a pretext for discrimination in order to recover. *Id.* In light of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), Plaintiff is no longer required to show pretext *plus* some additional evidence of discrimination. *Id.* at 148, 120 S.Ct. at 2109; *see Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) (applying *Reeves* in the context of an

ADEA claim). In other words, the Court may infer the ultimate fact of discrimination merely from the falsity of Defendants' proffered explanation. *Rowe*, 233 F.3d at 830. Nevertheless, Plaintiff, at all times, bears the ultimate burden of persuasion with respect to Defendants' alleged unlawful age discrimination. *Stokes*, 206 F.3d at 429.

In considering Plaintiff's prima facie case, the Court notes that Plaintiff has certainly met two of the four requisite elements, that is, the first and second elements. The record indicates that Plaintiff was born on April 15, 1948. As such, Plaintiff was well within the protected group of individuals that are at least forty years of age when she was terminated in 1997. Plaintiff has therefore satisfied the first element of her prima facie case. Plaintiff has also demonstrated that she was terminated from her job at CCC. In fact, Defendants admit that Plaintiff was terminated on August 31, 1999. (Br. Supp. Defs.' Mot. Summ. J., at 4.) It is therefore clear that Plaintiff has also satisfied the second element of her prima facie case.

■ With respect to the third element of Plaintiff's prima facie case, that she demonstrate that she was meeting the legitimate expectations of her employer, Plaintiff's show of proof is less convincing. Plaintiff claims that during the five years immediately prior to her termination, she was performing well, especially in the areas of client retention and sales, which, according to Plaintiff, were her primary

**9.** The Fourth Circuit originally required that the plaintiff be replaced by a person that was not a member of the protected class. *See, e.g., E.E.O.C. v. W. Elec. Co.*, 713 F.2d 1011, 1014 (4th Cir.1983). In *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), though, the Supreme Court held that replacement by a "substantially younger" employee was the proper formulation of the fourth element in the *McDonnell Douglas* analysis in the context of ADEA claims. The Court was influenced by the fact that the ADEA protects individuals from discrimination on the basis of age and not on the basis of membership in a protected class. *Id.*, 517 U.S. at 312, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433; *Stokes*, 206 F.3d at 430.

responsibilities. As evidence to support her assertions, Plaintiff claims that she received raises during the five year period prior to her termination. Furthermore, Plaintiff has submitted affidavits from a former supervisor and a co-worker, that is, Ms. Diana Veach and Mr. Russ Decker, respectively. These affidavits suggest that both Ms. Veach and Mr. Decker viewed Plaintiff as a conscientious employee and an asset to CCC.

In considering Ms. Veach's affidavit, though, the Court notes that in addition to the positive segments referenced by Plaintiff, it also contains information about Plaintiff that is not particularly favorable. Specifically, Ms. Veach's affidavit states that Plaintiff sometimes missed deadlines, and fell short in the areas of call frequency reporting and uncovering opportunities for electronic promotions. With respect to Mr. Decker's affidavit, the Court notes that Mr. Decker was simply a co-worker, and not one of Plaintiff's supervisors, as was Ms. Veach. As Fourth Circuit authority reveals, Mr. Decker's opinion of Plaintiff's work performance would not be relevant to the issue of whether Plaintiff was performing at a level that met her employer's legitimate expectations. In fact, the Fourth Circuit has held that when considering whether an employee met the legitimate expectations of the employer, a co-worker's opinion as to the quality of the employee's work is practically irrelevant. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir.), *cert. denied*, 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 125 (2000); *see also DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir.1998) (quoting *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir.1991), in stating that the opinions of co-workers as to the quality of an employee's work are "close to irrelevant"). In light of the problems regarding Plaintiff's work output highlighted by Ms. Veach's affidavit, as well as the fact that

Mr. Decker's opinion as to the quality of Plaintiff's work is virtually immaterial, it is not clear that Plaintiff has satisfied the third element of her prima facie case. Nevertheless, because the burden to establish a prima facie case is not particularly onerous, and the facts must be construed in favor of Plaintiff as the non-moving party, this Court finds that Plaintiff's proffer of evidence that she was meeting her employer's legitimate expectations is sufficient to satisfy the third element of Plaintiff's prima facie case. *See Young v. Lehman*, 748 F.2d 194 (4th Cir.1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 489 (1985) (noting that the burden to establish a prima facie case of discrimination is not substantial).

■ The fourth and final element of Plaintiff's prima facie case requires her to show that she was replaced by a substantially younger individual. Although this Court ultimately finds that Plaintiff has satisfied the fourth element of her prima facie case, the circumstances surrounding her replacement merit a more detailed discussion. Initially, in her Complaint, Plaintiff alleged that she was replaced by an individual in her twenties. The record indicates, however, that this individual, Ms. Rebecca Romosca, simply took over Plaintiff's office space and did not assume her duties or responsibilities. Obviously, the person who physically occupies Plaintiff's former office is not necessarily Plaintiff's replacement. According to Defendants, Plaintiff's duties were assumed by two primary individuals. The first of those individuals, Ms. Linda Nichols, is actually older than Plaintiff and, according to the record, is still employed with CCC. The other individual, Mr. Keith Still, was thirty-three during the relevant time period. Defendants claim that because Mr. Still was already employed by CCC when he assumed a portion of Plaintiff's respon-

sibilities, Plaintiff cannot demonstrate that he was a "replacement employee." Defendants' argument, however, undermines the purpose of the ADEA, to protect more senior employees from age discrimination. *See generally. U.S. v. Gregory,* 871 F.2d 1239, 1245–46 (1989), *cert. denied,* 493 U.S. 1020, 110 S.Ct. 720, 107 L.Ed.2d 740 (1990) ("Invoking a ... carryover rule when the result is ... discrimination is inevitably an end run around the statute and its preeminent purpose."). Defendants cannot attempt to avoid the requirements of the ADEA simply by shifting work left behind by a terminated employee to others already on the payroll. In other words, just because Plaintiff's duties were assumed by a substantially younger individual already employed by CCC does not mean that Plaintiff was not replaced by an individual outside of the protected age group.[10]

As to the satisfaction of the fourth element of her prima facie case, Plaintiff also indicates that a portion of her responsibilities were assumed by Ms. Kate Grubbs, age twenty-eight. Defendants do not respond to this contention in their briefs. Based on the age of Ms. Grubbs, and the fact that the Court chooses not to wholeheartedly accept Defendants' argument that Mr. Still was not a replacement employee, it appears that Plaintiff can demonstrate that she was replaced, at least in part, by a substantially younger employee. As such, this Court must find that Plaintiff has met her burden to establish the fourth element of her prima facie case. The Court's findings, therefore, indicate that Plaintiff has satisfied the requisite elements to establish a prima facie case, allowing her claim to initially withstand Defendants' Motion for Summary Judgment at this stage.

■ Given the Court's finding that Plaintiff has established her prima facie case, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory basis for their actions. *Stokes,* 206 F.3d at 429; *Hawkins,* 203 F.3d at 278. Defendants' burden, however, is one of production, requiring Defendants to merely proffer a legitimate reason for their employment decisions. *Hawkins,* 203 F.3d at 278. In their Brief in Support of Defendants' Motion for Summary Judgment, Defendants maintain that Plaintiff was terminated not because of her age, but rather, because she failed to satisfy the requirements of her performance improvement plan. Further, Defendants insist that Plaintiff was placed on the performance improvement plan simply because she was not satisfactorily performing her job. (Br. Supp. Defs.' Mot. Summ. J., at 10–11.) Poor job performance and failure to meet the rigors of a performance improvement plan are certainly legitimate reasons for terminating an employee. Therefore, the Court finds that Defendants have proffered a reason for Plaintiff's termination sufficient to satisfy their burden of production under the *McDonnell Douglas* framework.

■ Once Defendants' burden of production is satisfied, Plaintiff, in order to recover on her claim of age discrimina-

---

**10.** This conclusion has been recognized by the Fourth Circuit, particularly as it discusses claims for age discrimination under the ADEA in the context of reductions in force. Such claims prevent an employer from terminating older workers and distributing their workload among younger current employees. *See, e.g., Stokes v. Westinghouse Savannah River Co.,* 206 F.3d 420 (4th Cir.2000). Even though the instant case does not involve a reduction in force, the notion that an employer cannot replace an older employee by shifting work around to younger current employees would appear to be equally applicable to a consideration of whether Plaintiff has established the fourth element of her prima facie case, that she was replaced by a substantially younger employee.

tion, must show that Defendants' proffered reason is a pretext used to conceal discrimination. *Hawkins*, 203 F.3d at 278. In other words, Plaintiff must show that Defendants were actually and unlawfully motivated by age in their employment decisions. *Stokes*, 206 F.3d at 429. As previously stated, the central reason proffered by Defendants for Plaintiff's termination was the fact that after being placed on a performance improvement plan, she failed to satisfy one of its central requirements, that she complete her e-PS certification. In seeking to prove pretext, Plaintiff primarily relies on *Martin v. Nationwide Mut. Ins. Co.*, No. 1:99CV00956, 2001 WL 604192 (M.D.N.C. April 20, 2001). Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, however, can be read to raise three additional potential bases for the Court to consider in determining whether Defendants' explanation for their actions is merely a pretext for age discrimination.

As indicated previously, Plaintiff's principal basis for showing pretext relies on the factual holding of *Martin*. In *Martin*, this Court found that the plaintiff had raised a genuine issue with respect to pretext where he demonstrated that he was not placed on a performance improvement plan prior to the adverse employment action despite the recommendation of the human resources department that such a plan be utilized. *Martin*, 2001 WL 604192, at *7. The Court was further influenced by the fact that the plaintiff had received praise and a significant raise less than a year before his undesirable reassignment, and was subjected to comments about his age and his retirement plan just prior to such reassignment. *Id.* Despite Plaintiff's efforts to characterize herself as similar to the plaintiff in *Martin*, this Court notes that Plaintiff was, in fact, placed on a performance improvement plan prior to her termination. Furthermore, Plaintiff's

employment history was not full of praise and did not include a significant raise. Rather, Plaintiff had a history of receiving memos of concern, mediocre performance reviews, and received only what were characterized by Defendants as nominal raises. Finally, the Court notes that Plaintiff was never subject to the sort of direct age-related comments as was the plaintiff in *Martin*. Therefore, Plaintiff's attempt to create a self-comparison with the plaintiff in *Martin* is not persuasive so as to justify a finding of pretext with respect to Defendants' decision to terminate her employment.

As stated above, three additional arguments in support of Plaintiff's claim of pretext can be gleaned from Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment. First, Plaintiff argues that she was subjected to different standards during the e-PS certification process as compared to other employees. Specifically, Plaintiff claims that it was standard procedure to have at least one of the evaluators from the first e-PS presentation present at the second presentation. Plaintiff alleges that she was not afforded this benefit and that she had an entirely different panel of evaluators present at her second presentation. In support of this claim, Plaintiff cites a segment of Ms. Veach's deposition testimony. (*See* Pl.'s Br. Opp'n Defs.' Mot. Summ. J., at 6, 18.) Of course, as stated previously, successful completion of the e-PS certification process required an applicant to pass a written examination, as well as two separate phases of an oral presentation. Upon closer inspection of Ms. Veach's deposition testimony, the exact meaning Ms. Veach meant to convey is not entirely clear. Specifically, Ms. Veach stated that "[s]omeone always who was in the first one always went to the second one ...." (Veach Dep., at 52.) By those words, Ms.

Veach may have intended to suggest that in the event an applicant failed the first phase of the oral presentation, there would be at least one evaluator from the first attempt present at the applicant's second attempt. On the other hand, Ms. Veach's deposition testimony may also be read to suggest that once an applicant passed the first phase of the oral presentation, there would be one evaluator from the first phase sitting on the panel that judged the second phase. (*Id.*, at 52–53.) The confusion surrounding Ms. Veach's deposition testimony is echoed by Ms. Luann Marie Gallo, a former supervisor of Plaintiff's. In her deposition, Ms. Gallo indicated that it was not unusual for an entirely different panel to evaluate an applicant when sitting for a second attempt at the first phase of the oral presentation requirement. (Gallo Dep., at 194.) Plaintiff, however, never passed the first phase of the oral requirement, meaning she was never eligible to present the second phase. Therefore, to the extent that Ms. Veach's testimony is understood to mean that once an applicant passed the first phase of the oral presentation, an evaluator from the first phase would be present during the second phase, such a practice was never an issue in Plaintiff's case because she never passed the first phase. In any event, despite the point Ms. Veach intended to convey, this Court finds that even if Defendants did break from custom in providing Plaintiff with different evaluators during her second attempt at the first phase of the oral presentation, it would not rise to a level sufficient to indicate that Defendants' proffered reason for Plaintiff's termination was a pretext for discrimination.

Plaintiff's second additional argument in support of her claim of pretext involves a comparison with a co-worker, Mr. Keith Still. Plaintiff cites *Street v. Coin Wrap, Inc.*, No. CIV. A. CCB–99–1654, 2000 WL 964772 (D.Md. June 22, 2000), where the district court found some evidence of pretext because the employer treated others outside of the protected class differently than the plaintiff. *Id.*, 2000 WL 964772, at *7. *Street*, which was a race discrimination case, involved evidence that the employer would assign meaningless and mundane tasks to the plaintiff, but not to white employees. Plaintiff, though, has not shown that she was ever exposed to similar treatment. Plaintiff simply claims that Mr. Still's performance evaluations were similar to hers, yet notes that he was not forced to resign. The record indicates, however, that Mr. Still received higher scores on his performance evaluations than did Plaintiff on multiple occasions. Furthermore, there is no indication in the record that Mr. Still had either a history of receiving memos of concern or had been placed on a performance improvement plan in the past. Plaintiff's employment history, of course, includes both of these disciplinary actions. Therefore, Plaintiff cannot show pretext by claiming that she was treated less favorably than Mr. Still when the documents before the Court reveal that he had a better employment record than Plaintiff. *See generally Pierce v. Commonwealth Life. Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994) (stating that to establish discrimination by means of a comparison, the plaintiff must demonstrate that he was similarly situated to the employee to which he is comparing himself).

Plaintiff's third and final additional argument in support of her claim of pretext that can be drawn from Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment is that she was, in fact, meeting her employer's legitimate expectations. This claim, much like her other argument in favor of pretext, has no merit. The Fourth Circuit has plainly held that Plaintiff cannot establish discrimination by disagreeing with her employer's assess-

ment of her work performance. *Hawkins,* 203 F.3d 274, 280 (noting that in a wrongful discharge action, only the perception of the employer matters). Therefore, any indication in Plaintiff's brief that discrimination is evidenced by her claim that she was meeting her employer's expectations carries no weight in the Court's consideration of this issue.

In sum, each of the examples identified by Plaintiff in support of her claim of pretext are unpersuasive. Notwithstanding the Court's finding that Plaintiff has satisfied the requirements for a prima facie case, the Court now finds that Plaintiff has failed to show that Defendants' proffered reason for its employment decision was not the genuine basis for their actions. The Court, therefore, also finds that there is no genuine issue as to any material fact with respect to whether Defendants' asserted basis for terminating Plaintiff's employment was a pretext for age discrimination. Because there is no genuine issue as to Plaintiff's offer of direct evidence of discrimination, and no genuine issue as to Plaintiff's claim of pretext under the *McDonnell Douglas* framework, this Court finds that Defendants are entitled to judgment as a matter of law with respect to Plaintiff's claim of age discrimination in violation of the ADEA. Defendants' Motion for Summary Judgment is therefore GRANTED with respect to Plaintiff's First Claim for Relief, that is, her ADEA claim, and Plaintiff's First Claim for Relief is hereby DISMISSED.

2. Plaintiff's Second Claim for Relief: N.C. Gen.Stat. § 143–422.2

Defendants have also moved for summary judgment with respect to Plaintiff's Second Claim for Relief for wrongful termination in violation of North Carolina's public policy as set forth in the Equal Employment Practices Act, N.C. Gen.Stat. § 143–422.2. The statute states, in part:

It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees. It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

N.C. Gen.Stat. § 143–422.2.

In *Coman v. Thomas Manufacturing Co.,* 325 N.C. 172, 175–76, 381 S.E.2d 445, 447 (1989), the North Carolina Supreme Court created an exception to the at-will employment doctrine when an employee is discharged in contravention of public policy. Presumably, Plaintiff relies upon the holding in *Coman* to support her Second Claim for Relief.

In determining the parameters of an age discrimination claim under N.C. Gen.Stat. § 143–422.2, the Court should apply the same standards that apply under the ADEA. *Robinson v. Ladd Furniture, Inc.,* 872 F.Supp. 248, 253 (M.D.N.C.1994) (applying the ADEA in the context of an age discrimination case under N.C. Gen. Stat. § 143–422.2). Because the Court has determined that there is no genuine issue of material fact with respect to Plaintiff's claim under the ADEA, and Plaintiff's ADEA claim and Plaintiff's state law claim are based upon the same factual allegations and subject to the same evidentiary standards, the Court also finds that there

is no genuine issue of material fact with respect to Plaintiff's state law claim for wrongful termination. Consequently, the Court finds that summary judgment is also proper as to the Plaintiff's state law claim under N.C. Gen.Stat. § 143–422.2. Therefore, Defendants' Motion for Summary Judgment is GRANTED with respect to Plaintiff's Second Claim for Relief under N.C. Gen.Stat. § 143–422.2 and Plaintiff's Second Claim for Relief is hereby DISMISSED.

### 3. Defendants' Counterclaim: Conversion Under North Carolina Law

■ Finally, Defendants also seek summary judgment in their favor on their counterclaim. In conjunction with their Answer to Plaintiff's Complaint, Defendants filed a counterclaim, for conversion, seeking to recover funds mistakenly paid to Plaintiff. As stated above, after she was terminated, Plaintiff executed a liability waiver which entitled her to receive a severance check in the amount of $11,559.97. Plaintiff, however, revoked her signature on the waiver within the time period provided, and in so doing, became ineligible to receive any severance pay. Because of a mistake on the part of Defendants, though, funds totaling $11,559.97 were directly deposited into Plaintiff's bank account. Defendants, pursuant to their counterclaim, allege that Plaintiff wrongfully converted such funds, and seek to have the money returned to them.

In support of their position, Defendants note that Plaintiff, in her deposition, admitted that she knew she was not entitled to the funds when they appeared in her bank account. Furthermore, Plaintiff acknowledged that she ignored each of Defendants' demands to have the money returned to them. In fact, the only reason Plaintiff gave for not returning the money was that she had already spent it. Defendants therefore claim that because of Plaintiff's admissions, they are entitled to judgment in their favor on their counterclaim for conversion.

Plaintiff's response to Defendants' position is simple: she argues that in the instant case, an action for conversion is not proper.[11] More specifically, Plaintiff claims that Defendants cannot establish that she wrongfully came into possession of the money. Plaintiff further suggests that because she was not involved in the transaction that resulted in the money arriving in her account, she was not a wrongful possessor and therefore was not a convertor of the funds. Plaintiff, however, fails to acknowledge that she wrongfully exercised dominion over the funds by spending the money when she admittedly knew that the funds were not rightfully deposited into her account. Notably, an action for conversion does not lie only where the property at issue was improperly possessed by the alleged convertor. An action for conversion may also be sustained where the alleged convertor wrongfully used the property to the exclusion of the true owner's rights. *Spinks v. Taylor,* 303 N.C. 256, 264, 278 S.E.2d 501, 506 (1981) (defining conversion as the "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights"); *Gadson v. Toney,* 69 N.C.App. 244, 246, 316 S.E.2d 320, 321–22 (1984) ("To recover on a claim for conversion, [the] plaintiff must prove both ownership in himself and the wrongful posses-

---

11. In fact, Plaintiff suggests that an action in assumpsit may be more appropriate. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J., at 20–21.)

sion *or conversion* of the property by the defendant.") (emphasis added).[12] Therefore, Plaintiff cannot escape liability on Defendants' counterclaim for conversion simply by claiming that her possession and/or use of the funds was not wrongful, particularly in light of the fact that Plaintiff admittedly knew that the funds were not hers.

Plaintiff's argument can nevertheless be read to contend that an action for conversion is not proper here because, in general, actions for conversion involve either goods or personal property. *U.S. v. Gaskins*, 748 F.Supp. 366, 371 (E.D.N.C.1990). It has also been noted by this Court that when the property involved is money, such money may be the subject of an action for conversion *only* when it is capable of being identified and described as a specific chattel. *Cananwill, Inc. v. EMAR Group*, 250 B.R. 533, 549–50 (1999) (quoting C.J.S. *Trover & Conversion* § 23(1955)). In order to be "identified and describe as a specific chattel," the general rule is that the money must be segregated from other funds or kept in a separate bank account and not commingled with the alleged convertor's other funds. *Id.; see also Massive Paper Mills v. Two–Ten Corp.*, 669 F.Supp. 94, 96 (S.D.N.Y.1987) (denying conversion claim where money was not paid into a designated fund); *Willingham v. United Ins. Co. of Am.*, 628 So.2d 328, 333–34 (Ala.1993) (not recognizing conversion claim where funds were not segregated). In this case, because the funds at issue were directly deposited into Plaintiff's bank account, it appears that the funds were commingled. Nevertheless, the Court notes that commingled funds may still be the subject of an action for conversion if, "subsequent to the comming-ling, the convertor specifically identifies the funds." *Cananwill*, 250 B.R. at 550.

Although Plaintiff never specifically claims that the funds at issue were commingled, taken in the light most favorable to Plaintiff, such a claim can be reasonably inferred from her argument that an action for conversion is improper in the instant case, especially in light of the fact that the funds were directly deposited in her personal bank account. Because Defendants have produced no evidence that Plaintiff took any action to identify the funds after they were deposited in her bank account, this Court finds that there is a genuine issue of material fact as to whether an action for conversion of money is proper in this case. As such, Defendants' Motion for Summary Judgment is DENIED with respect to Defendants' counterclaim for conversion.

The Court also notes that Defendants' counterclaim for conversion was before the Court on supplemental jurisdiction. *See* 28 U.S.C. § 1367. Moreover, the federal claim upon which supplemental jurisdiction was grounded, that is Plaintiff's claim under the ADEA, is no longer before the Court. For that reason, this Court declines to exercise supplemental jurisdiction over Defendants' counterclaim for conversion. Defendants' counterclaim is therefore DISMISSED WITHOUT PREJUDICE to Defendants' right to pursue the matter in the appropriate state court with jurisdiction over the claim.

## IV. CONCLUSION

For the reasons stated above, the Court finds that there are no genuine issues of material fact with respect to both Plaintiff's claim under the ADEA and Plaintiff's wrongful termination claim under North

---

**12.** In the context used above, "conversion" is defined as the "[u]nauthorized and wrongful exercise of dominion and control over anoth-er's personal property, to exclusion of or inconsistent with rights of owner." Black's Law Dictionary 332 (6th ed.1990).

Carolina State law and that Defendants are entitled to judgment as a matter of law on those claims. The Court also finds, for the reasons stated above, that there is a genuine issue of material fact with respect to Defendants' counterclaim for conversion. Therefore, Defendants' Motion for Summary Judgment [Document # 14] is GRANTED IN PART to the extent that Plaintiff's First Claim for Relief under the ADEA and Plaintiff's Second Claim for Relief under North Carolina State law are hereby DISMISSED and DENIED IN PART to the extent that Defendants' Motion for Summary Judgment in their favor on their counterclaim for conversion is DENIED. The Court notes, however, that it had supplemental jurisdiction over Defendants' state law counterclaim for conversion pursuant to 28 U.S.C. § 1367. To the extent that the federal claim upon which supplemental jurisdiction was based is no longer before the Court, the Court declines to exercise supplemental jurisdiction over Defendants' counterclaim for conversion. Defendants' counterclaim for conversion is therefore DISMISSED WITHOUT PREJUDICE to Defendants' right to pursue its claim in the appropriate state court with jurisdiction over the matter.

An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.