Higgins v. Synergy Coverage Sols., LLC, 2020 NCBC 4.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

ARLENE B. HIGGINS,

        Plaintiff,

v.

SYNERGY COVERAGE
SOLUTIONS, LLC; SYNERGY
HOLDINGS, LLC; SYNERGY
INSURANCE COMPANY, and their
subsidiaries and affiliates; and
BRUCE A. FLACHS,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 12548

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED
COMPLAINT**

1.    **THIS MATTER** is before the Court on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (the "Motion") under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") in the above-captioned case.

2.    After reviewing the Motion, the briefs in support and opposition, the First Amended Complaint, certain documents identified and relied upon in Plaintiff's First Amended Complaint and submitted by Defendants in support of the Motion, and the arguments of counsel at the hearing on the Motion (the "Hearing"), the Court hereby **GRANTS in part** and **DENIES in part** the Motion.

> *Fosbinder Law Office, by Julie Fosbinder, for Plaintiff Arlene B. Higgins.*
>
> *Robinson, Bradshaw & Hinson, P.A., by Pearlynn Houck, Fitz E. Barringer, and Travis Hinman, for Defendants Synergy Coverage Solutions, LLC, Synergy Holdings, LLC, Synergy Insurance Company, and Bruce A. Flachs.*

Bledsoe, Chief Judge.

FACTUAL BACKGROUND

3.    The Court does not make findings of fact on motions to dismiss under Rule 12(b)(6).  Rather, the Court recites only the relevant allegations asserted in Plaintiff's First Amended Complaint to determine the Motion.

4.    This litigation arises from the termination of Plaintiff Arlene B. Higgins ("Higgins" or "Plaintiff") from her long-term employment with Defendant Synergy Coverage Solutions, LLC ("Synergy Solutions" or the "Company").  Higgins alleges that after she had been employed at Synergy Solutions for ten years, the Company terminated her employment in breach of an oral contract to employ her until the Company was sold, to prevent her from realizing the value of certain phantom units that might vest if she were an employee at the time of sale.  Alternatively, Higgins argues she was terminated because of her age.

5.    Synergy Solutions "operates as a managing general agent and underwriter, providing workers compensation administrative services for certain insurance companies[.]"  (First Am. Compl. ¶ 2 [hereinafter "FAC"], ECF No. 31.)  Defendant Synergy Holdings, LLC ("Synergy Holdings") is an insurance holding company and the parent of Synergy Solutions and Defendant Synergy Insurance Company ("Synergy Insurance").  Synergy Insurance is an affiliate of Synergy Solutions for which Synergy Solutions provides workers compensation administrative services.[1] (FAC ¶¶ 2–4.)

---

[1] Together Synergy Solutions, Synergy Insurance, and Synergy Holdings shall be referenced hereafter as the "Synergy Defendants."

6.     At all relevant times, Defendant Bruce A. Flachs ("Flachs") was the "Organizer, President, Manager, and Chief Executive Officer" of Synergy Solutions, and the "Organizer, President, Manager, and Member" of Synergy Holdings. (FAC ¶ 5.)

7.     Flachs and Higgins first began working together in the insurance industry in 1993. (FAC ¶ 9.) In August 2006, Flachs recruited Higgins to become the Chief Underwriting Officer of Synergy Solutions, a position she held until she was terminated in July 2017. (FAC ¶¶ 1, 8.) Higgins reported directly to Flachs, and Flachs conducted her annual performance reviews. (FAC ¶¶ 8, 18, 25–27, 35.)

8.     In July 2009, Synergy Holdings adopted a "Phantom Compensation Plan" ("Plan") to give employees of Synergy Holdings and its subsidiaries, including Synergy Solutions, the opportunity to receive bonus compensation for their services in the form of a cash payout of "Phantom Units" upon the sale of Synergy Holdings if certain conditions were met. (FAC ¶ 17; *see* Mem. Supp. Defs.' Mot. Dismiss Pl.'s FAC Ex. 1, at ¶ 9 [hereinafter the "Plan"], ECF No. 42.2.) Each grant of Phantom Units under the Plan was governed by the terms of a Phantom "Award Agreement" between the employee recipient and Synergy Holdings. (*See* Mem. Supp. Defs.' Mot. Dismiss Pl.'s FAC Exs. 2–5, [hereinafter "Award Agreement(s)"], ECF Nos. 42.3–42.6.) The Plan specifically provided that the value of any Phantom Units awarded to an employee would be paid to the employee upon the sale of 50% or more of Synergy Holdings's shares or upon the disposition of substantially all of the assets of that entity. (Plan ¶¶ 6(a), 17.) The Plan further provided, however, that any Phantom

Units awarded under the Plan would be "forfeited and cancelled immediately" upon termination of the employee's employment with Synergy Holdings or its affiliates, "voluntarily or involuntarily, with or without cause[.]"  (Plan ¶ 4(b).)

9. Higgins opted to receive four Phantom Unit awards under the Plan in lieu of bonuses and/or salary increases during her employment.  These Awards totaled 8,600 Phantom Units: 5,000 in August 2009, 600 in August 2012, 2,000 in July 2014, and 1,000 in July 2015.  (FAC ¶¶ 19, 22, 25–26.)[2]

10. According to Higgins, beginning in her 2009 performance review and continuing in each review thereafter, Flachs represented "that he was continuously pursuing and entertaining offers from third parties to purchase Synergy Holdings[.]" (FAC ¶ 18.)  Higgins also alleges Flachs told her "that her retention in her management role was critical to the success of the company. . . . [and that] she would benefit financially when the company would eventually sell." (FAC ¶ 18.)  According to Higgins, she relied on Flachs's representations in deciding to accept each award of Phantom Units.

11. Higgins's work responsibilities at Synergy Solutions and its affiliates increased with her seniority at the Company.  While continuing to serve as Synergy

---

[2] Higgins also alleges that in 2006, she accepted 25,000 Class B Units of stock in Synergy Holdings pursuant to a "Restricted Unit Plan," which have since vested.  (FAC ¶¶ 13–14.) Higgins accepted 2,500 additional Class B Units in December 2016 which were scheduled to vest on or about December 1, 2017.  (FAC ¶ 28.)  Higgins alleges that her Class B Units "were designated as 'subject to repurchase' if she left her employment."  (FAC ¶ 15.)  She avers that she requested information regarding the value of her Class B Units after her termination in September 2017, which Synergy Solutions refused to provide, and that the Company stated that it was not interested in repurchasing her units due to Plaintiff's potential litigation against the Company.  (FAC ¶ 44.)  Higgins does not base any claims in this action on her Class B Units.

Solutions's Chief Underwriting Officer, she took over management of the Company's "Premium Audit Department" in 2009, (FAC ¶ 20), and became a member of the Board of Directors of Synergy Insurance in 2012, (FAC ¶ 24). In 2014, she was given the additional title of Executive Vice President of Premier Markets and made Manager over Marketing. (FAC ¶ 24.) Higgins consistently received positive performance reviews from Flachs through July 2016. (*See* FAC ¶¶ 26–27.)

12. The relationship between Higgins and the Company deteriorated in 2017. Higgins alleges that "[o]n or about May 11, 2017, without any advance notice or prior discussion, Flachs informed Higgins of his plan to restructure the management of [Synergy Solutions,] . . . placed two managers in the chain of command between himself and Higgins, . . . reduced the number of employees directly reporting to Higgins[, and] moved Higgins from her office into one of the smallest offices in the building[.]" (FAC ¶ 31.) Two months later, on July 14, 2017, Flachs terminated Higgins's employment, stating in her termination letter that her "work performance d[id] not meet the standards set forth by [Synergy Solutions]." (FAC ¶ 35.) Higgins was fifty years old when she was terminated. (FAC ¶ 36.) Her responsibilities were given to an employee who was thirty-nine years old. (FAC ¶ 35.)

II.

PROCEDURAL HISTORY

13. Higgins initiated this action against Defendants on September 25, 2018, fourteen months after her termination. The case was designated as a mandatory

complex business case on November 9, 2018, (Designation Order, ECF No. 1), and assigned to the undersigned on the same day, (Assignment Order, ECF No. 2).

14. After Defendants moved to dismiss the Complaint on December 31, 2018, (Defs.' Mot. Dismiss, ECF No. 20), Higgins filed the First Amended Complaint as of right on February 7, 2019, (*see* FAC).

15. Higgins now asserts claims against Synergy Solutions for breach of contract, defamation, and, in the alternative, quantum meruit/unjust enrichment; and against all Defendants for common law fraud, fraud in the inducement, constructive fraud, violation of N.C.G.S. § 143-422.2, and violation of the North Carolina Securities Act, N.C.G.S. § 78A-1 et seq., and, in the alternative, negligent misrepresentation. Higgins also seeks an accounting of Synergy Holdings from the Synergy Defendants and asserts a claim in the alternative against the Synergy Defendants for alleged violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (*See* FAC.)

16. Defendants filed the Motion on March 12, 2019, seeking the dismissal of all claims asserted in the First Amended Complaint. (Defs.' Mot. Dismiss Pl.'s FAC [hereinafter "Mot. Dismiss FAC"], ECF No. 41.) The Motion has been fully briefed, and the Hearing on the Motion was held on May 21, 2019, at which all parties were represented by counsel. The Motion is now ripe for resolution.

III.

LEGAL STANDARD

17. In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court's inquiry is "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736 (2018) (quoting *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016)).

18. "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the . . . claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the . . . claim.' " *Id.*, 821 S.E.2d at 736–37 (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)). The Court will not grant a motion to dismiss "unless it appears to a certainty that [the] plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis and citation omitted).

19. The Court construes the allegations in the pleading "in the light most favorable to the non-moving party." *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5, 802 S.E.2d 888, 891 (2017) (quoting *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 852, 786 S.E.2d 919, 923 (2016)). The Court is "not required, however, 'to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

unreasonable inferences.' " *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)); *see also McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013) (treating plaintiffs' factual allegations as true but ignoring their legal conclusions). The Court may also "reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009) (citing *Schlieper v. Johnson*, 195 N.C. App. 257, 265, 672 S.E.2d 548, 553 (2009)).

IV.

ANALYSIS

A.    Breach of Contract (v. Synergy Solutions)

20.    Higgins's lawsuit largely rests on her allegation—stated in varying language throughout the First Amended Complaint—that she agreed to accept Phantom Units in lieu of bonuses and/or earned salary increases in exchange for the Company's express or implied promise that she would remain employed at Synergy Solutions through the sale of Synergy Holdings, at which time the Company would pay her the value of her Phantom Units in accordance with the Plan. (*See* FAC ¶¶ 18, 23, 26, 38, 50–52, 78, 84, 87, 94, 96.) She contends that Synergy Solutions

breached that agreement by terminating her employment before a sale could occur. (*See* FAC ¶ 53.)

21. To state a claim for breach of contract in North Carolina, a plaintiff must allege "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citing *Jackson v. Carolina Hardwood Co.*, 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995)). Additionally, a contract must be supported by consideration. *Inv. Props. of Asheville, Inc. v. Norburn*, 281 N.C. 191, 195, 188 S.E.2d 342, 345 (1972). Consideration for these purposes has been defined as "any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee." *Elliott v. Enka-Candler Fire & Rescue Dep't, Inc.*, 213 N.C. App. 160, 163, 713 S.E.2d 132, 135 (2011) (quoting *Lee v. Paragon Grp. Contractors, Inc.*, 78 N.C. App. 334, 337–38, 337 S.E.2d 132, 134 (1985)).

22. Synergy Solutions argues that Plaintiff's contract claim must be dismissed on two broad grounds. First, the Company argues that the Plan and Award Agreements are the final expression of the parties' agreement regarding Phantom Units and specifically disclaim Higgins's claimed entitlement to future employment. Second, Synergy Solutions argues that Higgins has failed to plead mutual assent and consideration, and that the Company's alleged promise—employment through the time of sale of Synergy Holdings—is not sufficiently definite to overcome the presumption of at-will employment under North Carolina law. (*See* Mot. Dismiss FAC 1–2.) The Court will address each argument in turn.

(1)     The Plan and Award Agreements as a Final Expression of Agreement

23.     As noted above, Higgins acknowledges in her First Amended Complaint that she received four Phantom Unit awards granting her a total of 8,600 units under the Plan. (*See* FAC ¶¶ 18, 19, 22, 25–26.) Defendants have attached to their Motion and supporting brief the Plan and the Award Agreements Higgins signed as a condition of her receipt of the Phantom Units. (*See* Plan; Award Agreements.) Higgins has not objected to the Court's consideration of the Plan or the Award Agreements on this Motion under Rule 12(b)(6) and, to the contrary, has focused parts of her argument on the specific terms of those documents. Accordingly, the Court concludes that it may consider the Plan and the Award Agreements on this Motion without converting it to one under Rule 56. *See Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60–61, 554 S.E.2d 840, 847 (2001) (holding that a court may consider under Rule 12(b)(6) "documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant[,]" including "a contract which is the subject matter of an action" (citations omitted)).

24.     Synergy Solutions argues that the terms of the Plan and the Award Agreements bar Higgins's claim for cash payment for her Phantom Units in exchange for her promise of continued employment. In support, Synergy Solutions notes that each Award Agreement contains a merger clause specifically providing that the Agreement, "together with the Plan, contain[ ] the entire understanding between the parties hereto with respect to the subject matter hereof, and supersede[ ] all prior written and oral statements, including any prior representation, statement, condition

or warranty." (Award Agreements ¶ 5.) Synergy Solutions also points out that the Plan expressly disclaims entitlement to continued employment:

> **No Employment Rights**. Nothing in this Plan will confer upon any Participant the right to continue in the employ or service of the Company or any of its Affiliates as an employee or otherwise for any period of time or interfere with or otherwise restrict in any way the rights of the Company or any of its Affiliates to terminate a Participant's employment or service at any time for any reason, with or without cause.

(Plan ¶ 9 (emphasis in original).) Reading these documents together, the Company argues that any alleged prior oral representations or agreements between Higgins and Flachs regarding Phantom Units are superseded by the Plan and the Award Agreements, barring Higgins's breach of contract claim. (*See* Mem. Supp. Defs.' Mot. Dismiss Pl.'s FAC 5–6 [hereinafter "Br. Supp. Mot. Dismiss"], ECF No. 42.)

25. "North Carolina recognizes the validity of merger clauses and has consistently upheld them." *Zinn v. Walker*, 87 N.C. App. 325, 333, 361 S.E.2d 314, 318 (1987) (citing cases). In particular, "merger clauses were designed to effectuate the policies of the [p]arol [e]vidence [r]ule; i.e., barring the admission of prior and contemporaneous negotiations on terms inconsistent with the terms of the writing." *Id.* Despite its title, "[t]he parol evidence rule is a rule of substantive law[.]" *Phelps v. Spivey*, 126 N.C. App. 693, 697, 486 S.E.2d 226, 229 (1997). As explained by the Court of Appeals:

> Generally, the parol evidence rule prohibits the admission of evidence to contradict or add to the terms of a clear and unambiguous contract. Thus, it is assumed the [parties] signed the instrument they intended to sign[,] . . . [and, absent] evidence or proof of mental incapacity, mutual mistake of the parties, undue influence, or fraud[,] . . . the court [does] not err in refusing to allow parol evidence[.]

*Drake v. Hance*, 195 N.C. App. 588, 591, 673 S.E.2d 411, 413 (2009) (quoting *Thompson v. First Citizens Bank & Tr. Co.*, 151 N.C. App. 704, 708–09, 567 S.E.2d 184, 188 (2002)).

26. To avoid enforcement of the merger clause, Higgins argues that she has pleaded she entered an employment agreement with Synergy Solutions that is separate and apart from her entry into the Award Agreements and thus not within their "subject matter." (Pl.'s Mem. Opp'n Defs.' Mot. Dismiss 11–13 [hereinafter "Br. Opp'n Mot. Dismiss"], ECF No. 44.) For support, she points to her allegations in paragraph 18 of her First Amended Complaint, which state in part that, based on Flachs's representations that Higgins's "retention in her management role was critical to the success of the company" and that she "would benefit financially when the company would eventually sell[,] . . . Flachs and Higgins agreed that she would remain employed with Synergy [Solutions] for their mutual benefit through the time of sale." (FAC ¶ 18.)

27. Higgins ignores, however, the context in which she pleads that these specific representations and agreements were allegedly made. Indeed, as pleaded, the alleged oral employment agreement, and each of Flachs's alleged verbal affirmations of that agreement, directly preceded the Company's offer, and Higgins's acceptance, of a grant of Phantom Units under the Award Agreements. (*See, e.g.*, FAC ¶ 18 (offer and acceptance of 2009 Phantom Units), ¶ 23 (offer and acceptance of 2012 Phantom Units), ¶ 25 (offer and acceptance of 2014 Phantom Units), ¶ 26 (offer and acceptance of 2015 Phantom Units), and ¶ 50 ("At each offering of Phantom Units, the statements

made to Higgins by Flachs, . . . gave rise to an enforceable employment agreement[.]").)

28. Higgins likewise ignores her many allegations that she received these Phantom Units and their promise of potential payout as compensation for her continued employment. (*See* FAC ¶ 18 ("Flachs . . . represented to Higgins that she would be rewarded for her . . . continued service to [Synergy Solutions] through . . . a cash payout under its Phantom Compensation Plan, when the Company was sold."), ¶ 23 ("Flachs also represented that his purpose in offering Phantom Units was to keep the senior management team in place and motivated so as to increase the company's value, from which Higgins would benefit at the time of sale."), ¶ 26 ("Higgins was offered and accepted 1,000 additional Phantom Units in response to Flachs's continued representations regarding . . . his pursuit of a sale with rewards for Higgins."), ¶ 52 ("Higgins'[s] employment and continued employment with [Synergy Solutions] . . . *were secured by and consideration for* representation made by Flachs that she would . . . receive a cash payment for her Phantom Units upon the sale of Synergy Holdings[.]" (emphasis added)).)

29. Consequently, rather than plead an agreement outside the "subject matter" of the Award Agreements as she contends, Higgins's First Amended Complaint specifically ties her alleged employment agreement to the offer and acceptance of Phantom Units under those Award Agreements. As such, by her own pleading, the alleged employment agreement is within the "subject matter" of the Award Agreements and the Plan and is subject to the Award Agreements' merger clause.

30.   Having so concluded, the Court next turns to whether the merger clause bars Higgins's breach of contract claim as a matter of law.  Significantly for that inquiry, Higgins has not pleaded or argued that the Plan or the Award Agreements are unclear or ambiguous in any respect or that they arguably recognize a right to her continued employment.  *See Mancuso v. Burton Farm Dev. Co.*, 229 N.C. App. 531, 542–43, 748 S.E.2d 738, 746–47 (2013) (enforcing merger clause where express contracts were "devoid of any unclear or ambiguous terms that need clarification based upon the consideration of parol evidence").  Indeed, as Higgins acknowledges, the Plan expressly disclaims to Higgins any "right to continue in the employ or service of the Company or any of its Affiliates as an employee or otherwise for any period of time[.]"  (Plan ¶ 9; Br. Opp'n Mot. Dismiss 11 ("[T]he Phantom Stock Plan language does not provide the basis for a contract claim for a term of employment[.]").)  Nor has Higgins pleaded with requisite particularity any fraudulent or negligent misconduct, (*see infra* IV.C, D), that might preclude application of the merger clause in the circumstances here, *see Zinn*, 87 N.C. App. at 333, 361 S.E.2d at 318 (acknowledging that a merger clause creates a presumption that "the writing represents the final agreement between the parties" that may be rebutted by establishing "fraud, bad faith, unconscionability, negligent omission[,] or mistake in fact").

31.   Instead, Higgins pleads the existence of an alleged employment agreement that flatly contradicts the express terms of the Plan.  (*See* Plan ¶ 9.)  Like the plaintiff in *Mancuso*, Higgins seeks "to establish the existence of a separate implied contract

rather than to explain the proper interpretation of an express contract[.]" *Mancuso*, 229 N.C. App. at 543, 748 S.E.2d at 746–47. In seeking to do so, however, Higgins "runs afoul of the legal principle that an implied contract will not be recognized in an instance covered by an express contract." *Id.*, 748 S.E.2d at 747; *see, e.g.*, *Vetco Concrete Co. v. Troy Lumber Co.*, 256 N.C. 709, 714, 124 S.E.2d 905, 908 (1962) ("It is a well recognized principle that there can be no implied contract where there is an express contract between the parties in reference to the same subject-matter." (quoting *Morganton Mfg. & Trading Co. v. Crews*, 165 N.C. 285, 290, 81 S.E. 418, 420 (1914))).

32. As a result, the parol evidence rule bars enforcement of the alleged oral employment agreement. *See, e.g.*, *Neal v. Marrone*, 239 N.C. 73, 77, 79 S.E.2d 239, 242 (1953) (finding that "parol testimony of prior or contemporaneous negotiations or conversations inconsistent with the writing, or which tend to substitute a new and different contract from the one evidenced by the writing, is incompetent"); *Phelps-Dickson Builders, LLC v. Amerimann Partners*, 172 N.C. App. 427, 436, 617 S.E.2d 664, 670 (2005) (holding that contract with merger clause barred parol evidence of additional terms); *Peoples Serv. Drug Stores, Inc. v. Mayfair, N. V. (Micora, N. V.)*, 50 N.C. App. 442, 449, 274 S.E.2d 365, 369–70 (1981) (disregarding parol evidence that varied, added to, and contradicted the express unambiguous terms of a contract with a merger clause).

33. The Court thus concludes that the merger clause must be given effect on the pleaded facts. The Court therefore concludes that the Plan and the Award

Agreements "contain[ ] the entire understanding" between Higgins and the Company concerning the Company's offer and Higgins's acceptance of Phantom Units and that those documents "supersede[ ] all prior written and oral statements, including any prior representation, statement, condition or warranty" concerning the offer and acceptance of Higgins's Phantom Units as a matter of law. (Award Agreements ¶ 5.) Accordingly, Higgins's claim for breach of an alleged oral employment agreement necessarily fails and her claim for breach of contract shall therefore be dismissed with prejudice.

### (2) Definite Term and Consideration

34. As separate and independent grounds for dismissal, the Court also concludes that the alleged agreement on which Higgins's breach of contract claim is based is unenforceable for failure to specify a definite term of employment and for lack of consideration.

35. Under North Carolina law, "in the absence of a contractual agreement between an employer and employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party." *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997) (citing *Soles v. City of Raleigh Civ. Serv. Comm'n*, 345 N.C. 443, 446, 480 S.E.2d 685, 687 (1997)). Furthermore, while North Carolina recognizes contracts for "permanent employment," such contracts "are terminable at will by either party" unless "the employee gives some special consideration in addition to his services[.]" *McMurry v. Cochrane Furniture Co.*, 109

N.C. App. 52, 56, 425 S.E.2d 735, 738 (1993) (quoting *Sides v. Duke Univ.*, 74 N.C. App. 331, 345, 328 S.E.2d 818, 828 (1985)); *see Tuttle v. Kernersville Lumber Co.*, 263 N.C. 216, 219, 139 S.E.2d 249, 251 (1964) (distinguishing between "steady employment, a steady job, a position of some permanence" for "which there is no additional expression as to duration," and employment contracts where a life term is specifically contemplated and supported by consideration additional to an employee's services).

36.     Defendants argue that because the sale of Synergy Holdings is an event that may or may not occur at some unfixed time in the future, Higgins's alleged agreement for employment until the sale or other disposition of Synergy Holdings was for an indefinite term, thus permitting the "pre-sale" at-will termination of Higgins' employment and requiring dismissal of Higgins's contract claim as pleaded here. In opposition, Higgins contends that employment until the sale of Synergy Holdings was for a definite term because North Carolina recognizes contracts for lifetime employment. (*See* Pl.'s Surreply Mem. Opp'n Defs.' Mot. Dismiss 5–6, ECF No. 49.)

37.     A term of employment is definite if it is for a "fixed period of time capable of exact measurement[,]" "tied to a certain date[,]" or "set at a date certain in the future[.]" *Kristufek v. Saxonburg Ceramics, Inc.*, 901 F. Supp. 1018, 1025 (W.D.N.C. 1995) (applying North Carolina law). "Even where an employment contract specifies compensation at a yearly, monthly, weekly, or daily rate, [the Court of Appeals] has held that if the term of service is not specified, the contract is for an indefinite period." *Wilkerson v. Carriage Park Dev. Corp.*, 130 N.C. App. 475, 477–78, 503 S.E.2d 138,

140 (1998) (citing *Freeman v. Hardee's Food Sys., Inc.*, 3 N.C. App. 435, 437–38, 165 S.E.2d 39, 41–42 (1969)).

38. Higgins's allegations here make plain that whether Synergy Holdings would be sold and the timing of any such sale were both uncertain. Thus, the alleged oral employment contract was for an indefinite term as a matter of law. *See Kristufek*, 901 F. Supp. at 1025 (holding, under North Carolina law, that an agreement that the plaintiff "would have his job with the defendant until the plaintiff retired" did not create a definite term); *Worley v. Bayer Corp.*, No. COA02-196, 2002 N.C. App. LEXIS 2501, at *4–7 (N.C. Ct. App. Dec. 17, 2002) (holding that an oral agreement that employment was only terminable upon the employee's "failure to report a mistake or an attempt to conceal a mistake" was not a definite term); *Wilkerson*, 130 N.C. App. at 478, 503 S.E.2d at 140 (holding that contractor's argument that the duration of his contract "could be implied from the time necessary to construct the 500 homes [he was contracted to build was] unpersuasive, as it [did] not address the dispositive question of whether the parties agreed he would work for a definite term").

39. Nor has Higgins pleaded any consideration that would bring her pleading within the North Carolina cases enforcing promises for lifetime employment as she contends. Higgins argues that her good work performance, her decision not to pursue other employment opportunities, and her agreement to defer compensation for her services by accepting Phantom Units in lieu of earned bonuses constituted consideration sufficient to support the alleged oral employment contract. (*See* FAC ¶¶ 25, 52; *see also* Br. Opp'n Mot. Dismiss 5.)

40. Higgins, however, like any employee, had a pre-existing duty to perform her responsibilities in good faith, *Dalton v. Camp*, 353 N.C. 647, 652, 548 S.E.2d 704, 708 (2001), and, in continuing in her employment, necessarily forewent other "present or future jobs[,]" *McMurry*, 109 N.C. App. at 57, 425 S.E.2d at 738 (quoting *Humphrey v. Hill*, 55 N.C. App. 359, 362–63, 285 S.E.2d 293, 296 (1982)). Thus, her promise to perform those acts that she was already bound to perform does not constitute sufficient consideration for the oral agreement. *See, e.g.*, *Franco v. Liposcience, Inc.*, 197 N.C. App. 59, 63, 676 S.E.2d 500, 503 (2009) (holding "mere continued employment by the employee is insufficient" consideration); *Burton v. Kenyon*, 46 N.C. App. 309, 311, 264 S.E.2d 808, 809 (1980) (holding "a promise to perform an act which the promisor [wa]s already bound to perform [wa]s insufficient consideration").

41. Additionally, Plaintiff's claimed exchange of earned bonuses for Phantom Units cannot provide consideration for continued employment here because, as discussed above, the Plan and the Award Agreements set forth the entire agreement of the parties with respect to Phantom Units and expressly disclaim any right to continued employment. (*See* Plan ¶ 9 (stating the Plan neither confers a right to employment, nor interferes or restricts the rights of the Company to terminate a Plan participant's employment at any time for any reason).)

42. Based on the foregoing, the Court concludes that Plaintiff's breach of contract claim should also be dismissed on each of these separate grounds.

B. Quantum Meruit/Unjust Enrichment (v. Synergy Solutions)

43. Higgins alleges in the alternative to her contract claim that Synergy Solutions was unjustly enriched by the value of her uncompensated services. (FAC ¶¶ 67–68.) Because she accepted Phantom Units in lieu of earned increases in her salary and/or bonuses, Higgins argues that the value of her uncompensated services for which she is entitled to payment is equal to the value of her Phantom Units. (*See* FAC ¶ 67.)

44. "In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 NCBC LEXIS 4, at *16 (N.C. Super. Ct. Jan. 12, 2017) (citing *Se. Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002)). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atl. Coast Line R.R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96, 150 S.E.2d 70, 73 (1966). However, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).

45. Generally, at the 12(b)(6) stage, courts decline to address unjust enrichment claims if a breach of contract claim remains viable. *See Shelton v. Duke Univ. Health*

*Sys.*, 179 N.C. App. 120, 125, 633 S.E.2d 113, 116 (2006) (stating on Rule 12(b)(6) motion that "[b]ecause we have not held the contract to be unenforceable, we do not address [plaintiff's unjust enrichment] argument"). In this instance, because the breach of contract claim must be dismissed, the Court addresses Plaintiff's claim for unjust enrichment.

46. Higgins argues that Synergy Solutions gratuitously benefited from her employment because the Company's value increased during her employment, (*see* FAC ¶ 68), and she did not receive the value of her Phantom Units or the increases in salary or bonuses she would have otherwise received. Plaintiff's apparent theory is that she had an implied contract to be paid the value of those Phantom Units because she gave up her right to current compensation to receive them.

47. As discussed above, however, Higgins has pleaded that she accepted the Phantom Units in accordance with the terms of the Plan and Award Agreements, and North Carolina law will not imply a contract where one already exists covering the same subject matter. *Atl. & E. Carolina Ry. Co. v. Wheatly Oil Co.*, 163 N.C. App. 748, 753, 594 S.E.2d 425, 429 (2004) ("The doctrine of unjust enrichment is based on 'quasi-contract' or contract 'implied in law' and thus will not apply . . . where a contract exists between two parties."). Because Higgins's unjust enrichment claim seeks to recover the alleged value of Phantom Units where Higgins's rights concerning those Phantom Units are governed by the pleaded Plan and Award Agreements, Higgins's unjust enrichment claim should be dismissed.

48.     Furthermore, the Plan and Award Agreements make plain that any benefit Synergy Solutions accepted from Higgins's employment after she began accepting Phantom Units in lieu of salary increases and/or bonuses was not gratuitous because Higgins received what she bargained for: the opportunity to cash out her Phantom Units if Synergy Holdings was sold before July 1, 2025, (Br. Supp. Mot. Dismiss Ex. 1, at 7, ECF No. 42.2), while she was an employee, (Plan ¶ 4), and for an amount such that the net sale proceeds exceeded $15,000,000, (Plan ¶ 5(a)); *see Champion Pro Consulting Grp., Inc. v. Impact Sports Football, LLC*, 976 F. Supp. 2d 706, 720–21 (M.D.N.C. 2013) (applying North Carolina law and dismissing unjust enrichment claim where plaintiffs had "already been compensated for the services upon which their unjust enrichment claim [wa]s based"); *see also BDM Invs. v. Lenhil, Inc.*, 2012 NCBC LEXIS 7, at *65 (N.C. Super. Ct. Jan. 18, 2012) ("Without enrichment, there can be no 'unjust enrichment' and therefore no recovery on an implied contract." (quoting *Greeson v. Byrd*, 54 N.C. App. 681, 683, 284 S.E.2d 195, 196 (1995))). Higgins's claim shall also be dismissed on this separate and independent basis.

C.     Fraud, Fraudulent Inducement, and Constructive Fraud (v. Synergy Defendants, Flachs)

49.     Higgins alleges that Defendants are liable for fraud, fraudulent inducement, and constructive fraud because Flachs omitted material facts and falsely represented that Higgins would benefit directly from the sale of Synergy Holdings and fraudulently induced her to work for and invest in Synergy Solutions by purchasing stock options and accepting Phantom Units in lieu of earned compensation, thereby depriving her of the value of her Phantom Units. (*See* FAC ¶¶ 84–87, 103.)

50. Common law or actual fraud arises from an arm's length transaction in which there was "(1) [a f]alse representation or concealment of a material [past or existing] fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) [and] result[s] in damage to the injured party." *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)). "Additionally, [a] plaintiff's reliance on any misrepresentations must be reasonable." *MacFadden v. Louf*, 182 N.C. App. 745, 747, 643 S.E.2d 432, 434 (2007) (quoting *RD&J Props. v. Lauralea-Dilton Enters.*, LLC, 165 N.C. App 737, 744, 600 S.E.2d 492, 498 (2004)).

51. To state a claim for fraudulent inducement, a plaintiff must allege:

(i) that [the] defendant made a false representation or concealed a material fact he had a duty to disclose[;] (ii) that the false representation related to a past or existing fact; (iii) that defendant made the representation knowing it was false or made it recklessly without knowledge of its truth; (iv) that defendant made the representation intending to deceive [the] plaintiff; (v) that [the] plaintiff reasonably relied on the representation and acted upon it; and (vi) [the] plaintiff suffered injury.

*Harton v. Harton*, 81 N.C. App. 295, 298–99, 344 S.E.2d 117, 119–20 (1986) (citing *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 253, 266 S.E.2d 610, 615 (1980)).

52. In contrast, constructive fraud "does not require the same rigorous adherence to elements as actual fraud." *Terry*, 302 N.C. at 83, 273 S.E.2d at 677. Rather, to sustain a constructive fraud claim, a plaintiff must allege breach of a confidential or fiduciary relationship by pleading "facts and circumstances (1) which created the relation of trust and confidence, and (2) [which] led up to and surrounded the consummation of the transaction in which [the] defendant is alleged to have taken

advantage of his position of trust to hurt [the p]laintiff." *Hunter v. Guardian Life Ins. Co. of Am.*, 162 N.C. App. 477, 482, 593 S.E.2d 595, 599 (2004) (quoting *State ex rel. Long v. Petree Stockton, LLP*, 129 N.C. App. 432, 445, 499 S.E.2d 790, 798 (1998) (internal quotation marks omitted)). "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the intent and showing that the defendant benefitted from his breach of duty." *Ironman Med. Props., LLC v. Chodri*, No. COA18-108, 2019 N.C. App. LEXIS 969, at *18 (N.C. Ct. App. Dec. 3, 2019) (citing *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004)). "This element requires a plaintiff to allege and prove that the defendant took 'advantage of his position of trust to the hurt of plaintiff' and sought 'his own advantage in the transaction.' " *Id*. at *18–19 (quoting *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997)).

53. Defendants move to dismiss Higgins's fraud claim for failure to allege a definite and specific representation and reasonable reliance. (Br. Supp. Mot. Dismiss 11, 23–26.) Defendants also argue that Plaintiff's fraudulent inducement and constructive fraud claims must fail on the independent basis that Higgins has not pleaded a confidential relationship or a duty owed to her by Defendants. (Br. Supp. Mot. Dismiss 20.) Because Defendants' arguments for dismissal focus on the overlapping elements of these claims, the Court turns to a review of these elements.

       (1)   <u>Misrepresentation of a Past or Existing Fact (Fraud & Fraudulent Inducement)</u>

54. Defendants assert that Plaintiff's fraud and fraudulent inducement claims should be dismissed because Higgins has failed to allege with particularity that

Defendants misrepresented a past or existing fact. Defendants contend that Higgins's allegations only "infer[ ] an 'implied promise' of continued employment" and do not show that Flachs "actually told her that she would remain employed" until the sale of Synergy Holdings. (Br. Supp. Mot. Dismiss 23.)

55. Under North Carolina law, "a mere promissory representation will not support an action for fraud." *Braun v. Glade Valley Sch., Inc.*, 77 N.C. App. 83, 87, 334 S.E.2d 404, 407 (1985) (citing *Phoenix Mut. Life Ins. Co.*, 300 N.C. at 255, 266 S.E.2d at 616). Nevertheless, "[a] speaker may not voice an opinion that he does not honestly believe, intending to deceive the listener, and then assert immunity from an action for fraud." *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *8–9 (N.C. Super. Ct. Mar. 27, 2018) (citing *Leftwich v. Gaines*, 134 N.C. App. 502, 508, 521 S.E.2d 717, 723 (1999)); *see Braun*, 77 N.C. App. at 87, 334 S.E.2d at 407 ("[A] promissory misrepresentation may constitute actual fraud if the misrepresentation is made with the intent to deceive and with no intent to comply with the stated promise or representation."). This is because an intentional "misrepresentation of the state of the promisor's mind" constitutes a misrepresentation of existing fact. *Overstreet v. Brookland, Inc.*, 52 N.C. App. 444, 452, 279 S.E.2d 1, 6 (1981).

56. Rule 9(b) requires "the circumstances constituting fraud" to be alleged "with particularity." N.C. R. Civ. P. 9(b). "The purpose of Rule 9(b) is to provide a defendant with sufficient notice of the fraud alleged 'in order to meet the charges.'" *Provectus Biopharm., Inc. v. RSM US LLP*, 2018 NCBC LEXIS 101, at *63 (N.C. Super. Ct. Sept. 28, 2018) (quoting *Terry*, 302 N.C. at 85, 273 S.E.2d at 678). "[I]n pleading

actual fraud the particularity requirement is met by alleging time, place[,] and content of the fraudulent representation, identity of the person making the representation[,] and what was obtained as a result of the fraudulent acts or representations." *Terry*, 302 N.C. at 85, 273 S.E.2d at 678. Thus, "a pleading is sufficiently particular 'if, upon a liberal construction of the whole pleading, the charge of fraud might be supported by proof of the alleged constitutive facts.' " *Provectus Biopharm., Inc.*, 2018 NCBC LEXIS 101, at *63 (quoting *Carver v. Roberts*, 78 N.C. App. 511, 513, 337 S.E.2d 126, 128 (1985)).

57. Higgins's articulation and characterization of Flachs's alleged promise of continued employment in the First Amended Complaint takes varying and inconsistent forms. (*See, e.g.*, FAC ¶ 18 ("Thus, Flachs and Higgins agreed that she would remain employed with Synergy [Solutions] for their mutual benefit through the time of sale."), ¶ 52 ("The employment contract . . . included an implied promise and term of duration that Higgins would remain employed and not be terminated, before Synergy Holdings was sold."), ¶ 85 ("Flachs sought Higgins'[s] continued employment with promises that she would be retained until the Company was sold[.]"), ¶ 94 ("[Flachs] represented to Higgins that he was pursuing a sale of the company and that she would benefit from the sale, directly implying that Higgins would not be terminated by [Synergy Solutions] before Synergy Holdings was sold.").)

58. Even reading the First Amended Complaint in the light most favorable to Higgins, the Court cannot conclude that Higgins has alleged a promissory representation with sufficient particularity to withstand Rule 12(b)(6) scrutiny. To

the contrary, at most Higgins has alleged that she inferred a promise of continued employment. "In the absence of a misrepresentation, there can be no actionable fraud[,]" *Am. Imps., Inc. v. G. E. Emps. W. Region Fed. Credit Union*, 37 N.C. App. 121, 125, 245 S.E.2d 798, 801 (1978) (citing *Ragsdale*, 286 N.C. at 138, 209 S.E.2d at 500), and an implied promise is not a representation, *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 610, 486 S.E.2d 443, 447–48 (1997) (affirming dismissal of fraudulent inducement claim where plaintiff alleged he relied on defendant's "implied promise"). Higgins's claims for fraud and fraudulent inducement shall therefore be dismissed to the extent they are premised upon Flachs's alleged misrepresentations.

(2) <u>Reasonable or Justifiable Reliance (Fraud & Fraudulent Inducement)</u>

59. Defendants contend that Higgins's fraud and fraudulent inducement claims should be dismissed on the separate ground that Higgins has failed to allege reasonable or justifiable reliance on Flachs's alleged misrepresentations. (Br. Supp. Mot. Dismiss 11.)

60. "[A] plaintiff may justifiably rely on representations made by a defendant with superior knowledge on a subject where the parties are not on equal footing and nothing about the defendant's representations should have given plaintiff cause to suspect the veracity of the representations." *Austin v. Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, at *33 (N.C. Super. Ct. Jan. 8, 2018) (citing *Walker v. Town of Stoneville*, 211 N.C. App. 24, 34, 712 S.E.2d 239, 246 (2011)). In other words, "when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to

investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346, 511 S.E.2d 309, 313 (1999) (citing *Rosenthal v. Perkins*, 42 N.C. App. 449, 452, 257 S.E.2d 63, 66 (1979)); *see Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 341 (4th Cir. 1998) ("[I]f a plaintiff had an alternative source for the information that is alleged to have been concealed from or misrepresented to him, his ignorance or reliance on any misinformation is not reasonable.").

61. Here, Flachs's representation that Higgins would remain employed through the sale of Synergy Holdings and therefore benefit from that sale is directly contradicted by the plain language of paragraph 9 of the Plan. As discussed above, Higgins has failed to plead an oral employment agreement distinct from her acceptance of Phantom Units through the Award Agreements, and paragraph 9 of the Plan explicitly provides that the Plan does not create a right to continued employment. (*See* Plan ¶ 9.)

62. Moreover, it was unreasonable for Higgins to rely on "vague assurances of continued employment" by Flachs without conducting an independent investigation into the circumstances here because such assurances do not supersede the presumption of at-will employment under North Carolina law. *See Kurtzman*, 347 N.C. at 334, 493 S.E.2d at 423–24 (holding that assurances of continued employment do not convert an at-will employment relationship to one for a definite term); *see also McMurry*, 109 N.C. App. at 57–58, 425 S.E.2d at 738–39 (stating that at-will

employment contracts require additional consideration to become binding for definite term).

63. Higgins alleges that once she began to question the truthfulness of Flachs's statements, she made reasonable inquiries on May 15, 2017 by asking both Flachs and Synergy Solutions's Chief Financial Officer whether her job was in jeopardy and was reassured by both that it was not. (FAC ¶ 88.) The 2017 assurances, however, cannot serve as reasonable justification for Higgins's acceptance of Phantom Units years before in 2009, 2012, 2014, and 2015. *See Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 33–34, 581 S.E.2d 452, 462–63 (2003) (holding that a plaintiff could not claim to have relied on information provided after a sale when deciding to make that sale).

64. Furthermore, Higgins has not alleged, and could not allege in good faith, that she was prevented from conducting her own investigation because, as a signatory, Higgins was charged with knowledge of the contents of the Plan and Award Agreements and their direct contradiction of her claim to continued employment. *See Biesecker v. Biesecker*, 62 N.C. App. 282, 285, 302 S.E.2d 826, 828–29 (1983) ("[A] person signing a written instrument is under a duty to read it for his own protection, and ordinarily is charged with knowledge of its contents. Nor may he predicate an action for fraud on his ignorance of the legal effect of its terms." (quoting 6 N.C. Index 3d, Fraud § 5)).

65. The Court thus concludes that Higgins's claims for fraud and fraudulent inducement should be dismissed for failure to allege reasonable or justifiable reliance

on Flachs's alleged misrepresentations. *See Hudson-Cole Dev. Corp.*, 132 N.C. App. at 346–47, 511 S.E.2d at 313 (affirming dismissal of fraud claim for lack of reasonable reliance where information was available in public record, stating that "where the facts are insufficient as a matter of law to constitute reasonable reliance on the part of the complaining party, the complaint is properly dismissed under Rule 12(b)(6)"); *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at *32 (N.C. Super. Ct. Oct. 21, 2016) (dismissing fraud claim for plaintiffs' failure to allege they "relied on alleged misrepresentations intended to deceive either of them"); *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC LEXIS 11, at *58 (N.C. Super. Ct. Feb. 19, 2013) (dismissing common law fraud claim because plaintiffs could not have reasonably relied on a memorandum they never read).

  (3) <u>Confidential Relationship (Fraudulent Inducement &
     Constructive Fraud)</u>

66. Defendants contend that Plaintiff's constructive fraud and fraudulent inducement claims, to the extent they are predicated on a material omission, must be dismissed for failure to allege a confidential or fiduciary relationship. (Br. Supp. Mot. Dismiss 20.)

67. "Constructive fraud arises where a confidential or fiduciary relationship exists[.]" *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 317 N.C. 110, 115, 343 S.E.2d 879, 884 (1986). For the purposes of a fraudulent inducement claim,

> [a] duty to disclose arises where: (1) "a fiduciary relationship exists between the parties to the transaction"; (2) there is no fiduciary relationship and "a party has taken affirmative steps to conceal material facts from the other"; [or] (3) there is no fiduciary relationship and "one party has knowledge of a latent defect in the subject matter of the

negotiations about which the other party is both ignorant and unable to discover through reasonable diligence."

*Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696, 682 S.E.2d 726, 733 (2009) (quoting *Sidden v. Mailman,* 137 N.C. App. 669, 675, 529 S.E.2d 266, 270–71 (2000)).

68. Higgins alleges that she and Flachs had a confidential relationship through the twenty-four-year working relationship between them "during which time Flachs twice hired Higgins to work in critical positions for other companies he controlled," by inducing Higgins to leave a secure position to work at Synergy Solutions, and through encouraging her to invest in Synergy Solutions. (FAC ¶ 85.) Plaintiff contends that the Synergy Defendants owed her a legal duty through Flachs as "their CEO and control person." (FAC ¶¶ 85, 95.)

69. North Carolina law is clear, however, that the relationship of an employer or its supervisor to an employee is not confidential and, without more, does not give rise to a fiduciary duty. *See Dalton*, 353 N.C. at 652, 548 S.E.2d at 708 ("[T]he relation of employer and employee is not one of those regarded as confidential." (quoting *King v. Atl. Coast Line R.R. Co.*, 157 N.C. 44, 62–63, 72 S.E. 801, 808 (1911))); *see also Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 410, 742 S.E.2d 535, 542 (2012) ("[I]n the absence of some unusual set of facts that would suffice to differentiate the relationship between [the employer] and [the employee] from other employer-employee relationships, [the employee] did not have a fiduciary relationship with [his employer]."); *Reichhold Chems., Inc. v. Goel*, 146 N.C. App. 137, 155, 555 S.E.2d 281, 292 (2001) ("A managerial position alone does not demonstrate

the requisite domination and influence on the other required to create a fiduciary obligation." (internal quotation marks and citations omitted)).

70.    As pleaded here, Higgins's relationship with Defendants is contractual, and "parties to a contract do not thereby become each other[']s[ ] fiduciaries; they generally owe no special duty to one another beyond the terms of the contract[.]" *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (1992).  Furthermore, Higgins has failed to allege the sort of domination and influence our courts have required to create a fiduciary duty between an employer and its employee.  *See S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008) ("Only when one party figuratively holds all the cards—all the financial power or technical information, for example—have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." (quoting *Broussard*, 155 F.3d at 348)); *see also Austin Maint. & Constr., Inc.*, 224 N.C. App. at 410, 742 S.E.2d at 542 (holding that employee did not owe fiduciary duty where only confidence reposed in him was competent performance of his assigned duties, and he was a "relatively small cog in a very large operation"). Accordingly, Plaintiff's fraudulent inducement and constructive fraud claims must be dismissed.  *See, e.g.*, *Chisum v. Campagna*, 2017 NCBC LEXIS 102, at *19–20 (N.C. Super. Ct. Nov. 7, 2017) (dismissing constructive fraud claim for failure to allege fiduciary duty); *Kingsdown, Inc. v. Hinshaw*, 2015 NCBC LEXIS 30, at *26 (N.C. Super. Ct. Mar. 25, 2015) (same).

D. Negligent Misrepresentation (v. Synergy Defendants, Flachs)

71. Higgins alleges a claim for negligent misrepresentation as an alternative to her fraud and fraud in the inducement claims.

72. Like fraud-based claims, "[t]he tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988) (citation omitted). For the purposes of assessing a negligent misrepresentation claim,

> [j]ustifiable reliance is analogous to reasonable reliance in fraud actions. Reliance is not reasonable if a plaintiff fails to make any independent investigation[ ] or fails to demonstrate he was prevented from doing so. To establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence.

*Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, at *31 (internal quotation marks, citations, and alterations omitted).

73. For the reasons discussed above, (*see supra* IV.C(2)), Plaintiff's allegations in support of reasonable or justifiable reliance fall short. As a result, Plaintiff's negligent misrepresentation claim must be dismissed. *See, e.g., Vigus v. Milton A. Latta & Sons Dairy Farms, Inc.*, No. COA08-700, 2009 N.C. App. LEXIS 830, at *34 (N.C. Ct. App. May 19, 2009) ("If a plaintiff's own evidence tends to show that he/she was not justified in relying upon the misrepresentation of a defendant, then he/she is in effect contributorily negligent[,]" and is barred from recovery (citation omitted)); *Hudson-Cole Dev. Corp.*, 132 N.C. App. at 346–47, 511 S.E.2d at 313 (affirming

dismissal of negligent misrepresentation claim for failure to allege reasonable reliance); *Value Health Sols., Inc. v. Pharm. Research Assocs., Inc.*, 2019 NCBC LEXIS 70, at *32 (N.C. Super. Ct. Sept. 6, 2019) (dismissing negligent misrepresentation and fraud claims because plaintiff did "not allege that it was denied an opportunity to investigate the veracity of the misrepresentations or that it could not have learned the true facts by exercising reasonable diligence").[3]

E.    Defamation (v. Synergy Solutions)

74.    Higgins alleges that in August 2017, following her termination, her supervisor at Synergy Solutions told a prospective employer that Higgins was fired for "performance reasons" with knowledge that the statement was false.  (FAC ¶¶ 40–41, 57–58.)  Defendants argue that Plaintiff has failed to allege facts sufficient to hold Synergy Solutions vicariously liable for the alleged acts of this unnamed employee.  (*See* Mot. Dismiss FAC 2.)

75.    In North Carolina, the post-termination statements of an employer's agent about the basis for an employee's termination are not within the agent's scope of employment and are therefore not attributable to the employer.  *See Stutts v. Duke Power Co.*, 47 N.C. App. 76, 81, 266 S.E.2d 861, 865 (1980) (finding no vicarious liability where plaintiff alleged his former manager made a false statement about his dishonesty to prospective employers after his termination).  Thus, Higgins's defamation claim must be dismissed on this basis.

---

[3] In light of the above, the Court need not address Defendants' additional arguments for dismissal of this claim under the economic loss rule and for an alleged failure to plead a duty of care.

76. Separately, North Carolina law requires defamation claims to meet "heightened pleading requirements." *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 111, at *15 (N.C. Super. Ct. Dec. 1, 2017). Not only must a plaintiff "recite the defamatory statement verbatim 'or with sufficient particularity to enable the court to determine whether the statement was defamatory[,]' " *id.* (quoting *Stutts*, 47 N.C. App. at 84, 266 S.E.2d at 866), but "the relevant pleading must allege 'who said what to whom, as well as when and where the defamatory statements were made[,]' " *id.* (quoting *Gosnell v. Reid*, No. 5:14CV179-RLV, 2015 U.S. Dist. LEXIS 96878, at *21 (W.D.N.C. July 24, 2015), *aff'd by Gosnell v. Catawba Cty.*, 646 F. App'x 318 (4th Cir. 2016)).

77. Higgins has identified the maker and recipient of the allegedly defamatory statement simply as a "supervisor" and a "prospective employer," respectively. Such lack of specificity fails North Carolina's heightened pleading requirement. *See, e.g.*, *Wynn v. Tyrrell Cty. Bd. of Educ.*, No. COA16-1130, 2017 N.C. App. LEXIS 358, at *8–9 (N.C. Ct. App. May 16, 2017) (dismissing defamation claim that did not identify maker or recipient of alleged statement); *Addison Whitney, LLC*, 2017 NCBC LEXIS 111, at *15–16 (holding allegation "that agents or employees of [the plaintiff] stated to 'its own customers' and to companies that might 'be interested in conducting business with the Defendants that Defendants cannot be trusted to maintain the confidentiality of the customers' and companies' sensitive business information' " was not sufficiently particular).

78.    For each of these independent reasons, Plaintiff's defamation claim should be dismissed.

F.    North Carolina Securities Act (v. Synergy Defendants, Flachs)

79.    Higgins alleges that Defendants have violated the North Carolina Securities Act ("NCSA") by inducing her to accept Phantom Units through misrepresentations and material omissions.  (*See* FAC ¶¶ 73–76.)  Defendants move to dismiss because Plaintiff has failed to allege that she was offered a security within the meaning of the NCSA and that Defendants violated N.C.G.S. § 78A-56(a)(1) or (a)(2).  (*See* Mot. Dismiss FAC 2.)

(1)    Phantom Units as "Securities"

80.    The NCSA defines a security as:

> any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract . . . ; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under a title or lease; viatical settlement contract or any fractional or pooled interest in a viatical settlement contract; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

N.C.G.S. § 78A-2(11).  Phantom stock is not listed as a security in N.C.G.S. § 78A-2, and North Carolina courts have not addressed whether phantom stock is a security under the NCSA.

81.    This Court has previously turned to federal authority under the Securities and Exchange Act of 1934 for guidance in interpreting the NCSA, particularly with

respect to the definition of a "security." *See, e.g., Vestlyn BMP, LLC v. Balsam Mountain Grp., LLC*, 2016 NCBC LEXIS 48, at \*31 (N.C. Super. Ct. June 22, 2016) ("Recognizing the dearth of case law interpreting the NCSA, this Court previously has found guidance in interpreting the NCSA's definition of 'security' in decisions interpreting the strikingly similar federal definition of 'security' found in the Securities Exchange Act of 1934."); *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at \*21–28 (relying on federal authority to determine whether tenant-in-common interest was an " 'investment contract' included in the broader definition of 'security' "). Federal decisions place emphasis on "the economic realities of the transaction . . . [and] have developed analyses for determining whether instruments . . . exhibit the sort of economic characteristics that warrant classification as a security." *Vestlyn BMP, LLC*, 2016 NCBC LEXIS 48, at \*31–32 (citing federal cases); *see Secs. & Exch. Comm'n v. Edwards*, 540 U.S. 389, 393–94 (2004) (stating test for determining whether an instrument is an investment contract (citing *Secs. & Exch. Comm'n v. W. J. Howey Co.*, 328 U.S. 293, 301 (1946))).

82. Analyzing the economic characteristics of an alleged security "necessarily requires an analysis of the facts surrounding the transaction or instrument at issue[,] and "[a]lthough this is a fact-intensive analysis, North Carolina courts have undertaken such an analysis at the motion to dismiss stage based on the facts alleged in the complaint." *Vestlyn BMP, LLC*, 2016 NCBC LEXIS 48, at \*32 (citing *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at \*21–28). Where a plaintiff fails to allege sufficient facts to permit a conclusion that the instrument at issue is a

security, our courts have dismissed NCSA claims under Rule 12(b)(6). *See, e.g., id.* at *33–34 (granting motion to dismiss NCSA claim for failure to support conclusory allegation that instrument was a security with factual allegations).

83. Higgins does not allege in her First Amended Complaint how the Phantom Units she received qualify as "securities" under N.C.G.S. § 78A-2, but she argues in her opposition brief, without citation to legal authority, that "[t]he Units may be deemed stock, a certificate of interest or participation in a profit sharing agreement, and/or an investment contract." (Br. Opp'n Mot. Dismiss 33–34.) The Court disagrees.

84. First, the First Amended Complaint, Plan, and Award Agreements do not support Higgins's claim that the Phantom Units are phantom stock and thus "stock" under the NCSA. The Plan does not identify the Phantom Units as phantom stock, and, more importantly, the Phantom Units do not track the value of Synergy Holdings's shares, and Phantom Unit holders are not entitled to distributions before a Liquidity Event occurs. (*See* Plan ¶ 5(a) (providing calculation for determining value of Phantom Units), ¶ 6 (setting forth payment structure under the Plan).)

85. Even if the Units could be characterized as phantom stock, several federal courts have persuasively reasoned that phantom stock is not "stock" under federal securities laws because it does not grant the holder equity. *See Byrd v. Visalus, Inc.*, No. 17-cv-12626, 2018 U.S. Dist. LEXIS 57826, at *13–14 (E.D. Mich. Apr. 5, 2018) (declining to categorize units referenced as "real equity" as phantom stock); *Bunnell v. Netsch*, No. 3:12-CV-03740-L, 2013 U.S. Dist. LEXIS 82030, at *20–22 n.3 (N.D.

Tex. June 11, 2013) (stating that phantom stock is not stock); *In re Enron Corp. Secs.,* *Derivative & "ERISA" Litig.*, 284 F. Supp. 2d 511, 530 n.2 (S.D. Tex. 2003) ("[P]hantom stock is not actually stock."); *Estate of Hurford v. Comm'r*, Nos. 23954-04, 23964-04, 2008 Tax Ct. Memo LEXIS 276, at *5 (T.C. Dec. 11, 2008) (stating that phantom stock is not stock).

86.    Higgins does not allege, and the Plan does not provide, that the Phantom Units represent "real equity" in Synergy Holdings.  Rather, the Phantom Units are instruments that are assigned value under a formula provided in the Plan upon the sale of Synergy Holdings at or above a certain price.  (*See* Plan ¶¶ 3, 5–6.)  As such, the Phantom Units are not "stock" within the NCSA.

87.    Neither are the Phantom Units a participation in a profit-sharing agreement or an investment contract.  North Carolina's administrative code defines "investment contract" under the NCSA but not profit-sharing agreements.  *See* 18 N.C. Admin. Code 6A.1104(8) (stating that an investment contract under N.C.G.S. § 78A-2(11) includes "[a]ny investment in a common enterprise with the expectation of profit to be derived through the essential managerial efforts of someone other than the investor" or "[a]ny investment by which an offeree furnishes initial value to an offeror," where that value is subject to the risks of the enterprise, the offeror makes representations that a value additional to the initial value will accrue, and the offeree does not exercise control over the enterprise).

88.    Under federal law, courts do not distinguish between "investment contracts" and "profit-sharing agreements" when determining whether an instrument is a

security.  *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558 n.11 (1979) ("[R]espondent here does not seriously contend that a 'certificate of interest . . . in any profit-sharing agreement' has any broader meaning under the Securities Acts than an 'investment contract.' " (citation omitted)); *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975) (stating that the "*Howey* test" for investment contracts stated in *W. J. Howey Co.*, 328 U.S. at 301, "embodies the essential attributes that run through all of the Court's decisions defining a security").  This Court shall therefore treat the question of whether Higgins has alleged an investment contract or profit-sharing agreement as a single inquiry.

89.    North Carolina law does not define what constitutes an "investment" or an "initial value" for the purposes of an investment contract, but the *Howey* test employed by the federal courts is clear that the determinative inquiry "is whether the scheme involves an investment of *money* in a common enterprise with profits to come solely from the efforts of others."  *W. J. Howey Co.*, 328 U.S. at 301 (emphasis added); *see State v. Heath*, 199 N.C. 135, 138, 153 S.E. 855, 857 (1930) ("[An investment contract has] been variously defined as *the conversion of money* into property from which a profit is to be derived in the ordinary course of trade or business; an *expenditure* for profits; *the placing of capital* to secure an income from its use." (emphasis added)).

90.    Labor, which is all that Higgins exchanged for her Phantom Units, is therefore not an investment for the purposes of this inquiry.  *See Heath*, 199 N.C. at 139, 153 S.E. at 858 (holding that a "contract [that did] not contemplate the placing

of [the plaintiff]'s money with the [defendants] in a way intended to secure an income from its employment by them in the conduct of the business" was not an investment contract or a profit-sharing agreement). The United States Supreme Court has explained that:

> [o]nly in the most abstract sense may it be said that an employee "exchanges" some portion of his labor[.] He surrenders his labor as a whole, and in return receives a compensation package that is substantially devoid of aspects resembling a security. . . . Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment.

*Int'l Bhd. of Teamsters*, 439 U.S. at 560.

91. For these same reasons, Higgins's alleged forbearance in accepting salary and commissions in exchange for Phantom Units is not an investment subject to the NCSA. As a result, Higgins has failed to plead that the Phantom Units constitute a "security" under the NCSA. Plaintiff's NCSA claim must therefore be dismissed for failure to allege an offer or sale of a security under the statute.

      (2)    <u>Reasonable or Justifiable Reliance</u>

92. Separately, Defendants argue that even if the Phantom Units constituted securities under the NCSA, Higgins has failed to adequately plead a violation of N.C.G.S. §§ 78A-56(a)(1) or 78A-56(a)(2). The NCSA creates primary civil liability against:

> (a) Any person who:

> (1) Offers or sells a security in violation of [N.C.]G.S. 78A-8(1), 78A-8(3),[4] 78A-10(b), 78A-13, 78A-14, 78A-24, or 78A-36(a), or of any rule

---

[4] N.C.G.S. §§ 78A-8(1) and 78A-8(3) state that
> [i]t is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

or order under [N.C.]G.S. 78A-49(d) which requires the affirmative approval of sales literature before it is used, or of any condition imposed under [N.C.]G.S. 78A-27(d) or 78A-28(g), or

(2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission[.]

N.C.G.S. § 78A-56(a). The NCSA creates secondary liability for "[e]very person who directly or indirectly controls a person liable under [Section 78A-56(c)]." *Id.* at § 78A-56(c)(1).

93. Higgins argues that Defendants violated the NCSA because she:

entered into the phantom stock agreements because of the misrepresentations of Flachs[.] In particular, . . . Flachs made statements to Higgins concerning the value of the company and confirmed the Phantom Units were offered in lieu of compensation, and that he was pursuing a sale of the company, and made the untrue statement of material fact that she would benefit from that sale. Flachs agreed that Higgins would not be terminated by [Synergy Solutions] before Synergy Holdings was sold.

(Br. Opp'n Mot. Dismiss 35–36; *see* FAC ¶¶ 78–79.)

94. Defendants argue that Higgins has not pleaded a cognizable claim under N.C.G.S. § 78A-56(a)(1) predicated on a violation of N.C.G.S. §§ 78A-8(1) or 78A-8(3) because she has not pleaded justifiable reliance, (Reply Supp. Defs.' Mot. Dismiss Pl.'s FAC 8, ECF No. 48), and has not alleged that Flachs made an untrue statement or omission of which she was unaware under N.C.G.S. § 78A-56(a)(2).

---

(1) To employ any device, scheme, or artifice to defraud, . . . [or]
(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

95. As an initial matter, this Court has held that "scienter and justifiable reliance are elements of a violation of § [78A-]8(1) or (3) . . . as those subsections of § [78A-]8 are clearly grounded on fraud." *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at \*33; *see Piazza v. Kirkbride*, 246 N.C. App. 576, 598, 785 S.E.2d 695, 709 (2016) (comparing section 78A-56(a)(1) to common law fraud claims); *Regal Inv. Advisors, LLC*, 2018 NCBC LEXIS 3, at \*41–42 (concluding N.C.G.S. §§ 78A-8(1) and 78A-8(3) require proof of scienter and justifiable reliance).

96. Furthermore, because Higgins is charged with knowledge of the Plan and Award Agreements, *see Biesecker*, 62 N.C. App. at 285, 302 S.E.2d at 828–29, Higgins cannot claim that Defendants sold her securities "by means of an untrue statement of a material fact" on which she reasonably relied under N.C.G.S. § 78A-56(a)(1), or of which she had no knowledge under N.C.G.S. § 78A-56(a)(2). The Plan's terms make clear that there was no guarantee that Higgins would be able to cash out her Phantom Units, that a cash out would occur only if she was employed when Synergy Holdings was sold, and then only if the net sale proceeds exceeded $15,000,000. Plaintiff's NCSA claim shall therefore be dismissed on this additional basis.

G. <u>Violation of the Age Discrimination Employment Act and Wrongful Discharge (v. Synergy Defendants, Flachs)</u>

97. Higgins avers in the alternative that she was wrongfully terminated in violation of the Age Discrimination Employment Act ("ADEA"), which provides that "[i]t shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age[,]" 29 U.S.C. § 623(a)(1), and in violation of North Carolina public policy as set forth in the North Carolina Equal Employment Practices Act

("NCEEPA"), which also prohibits discharge of employees based on age, N.C.G.S. § 143-422.2 ("It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of . . . age . . . by employers which regularly employ 15 or more employees.").

98.   The NCEEPA does not provide a private right of action. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). "[M]ost courts have applied the NCEEPA only to common law wrongful discharge claims or in connection with other specific statutory remedies." *Id.* (citing cases); *see, e.g.*, *Green-Hayes v. Handcrafted Homes, LLC*, No. COA14-904, 2015 N.C. App. LEXIS 504, at *1 (N.C. Ct. App. June 16, 2015) (affirming 12(b)(6) dismissal of NCEEPA claim due to absence of companion wrongful discharge claim). "[C]laims asserting the [NC]EEPA statute as the public policy pronouncement are analyzed in accordance with the proof scheme applicable to federal discrimination claims[,]" *Hill v. Belk Stores Servs., Inc.*, No. 3:06-CV-398, 2009 U.S. Dist. LEXIS 68399, at *14 (W.D.N.C. Aug. 5, 2009); here, the applicable law is the ADEA, *id*; *see Alderman v. Inmar Enters., Inc.*, 201 F. Supp. 2d 532, 546 (M.D.N.C 2002) ("In determining the parameters of an age discrimination claim under N.C.[G.S.] § 143-422.2, [a court] should apply the same standards that apply under the ADEA."). Therefore, if a "[p]laintiff's ADEA claim fails, his [state] claim for wrongful discharge on the basis of unlawful age discrimination also fails." *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 875 (M.D.N.C. 2003).

99.     Ultimately, "[t]o succeed on an ADEA claim, [the plaintiff] 'must prove, by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.' " *Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413 (4th Cir. 2010) (quoting *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 177–78 (2009)).

100.     Higgins alleges her wrongful discharge claim against all Defendants and her ADEA claim against the Synergy Defendants.    Flachs moves for dismissal of Plaintiff's wrongful discharge claim on the basis that supervisors may not be held liable in their individual capacity for wrongful discharge.  (Br. Supp. Mot. Dismiss 32 n.10.)  The Synergy Defendants move to dismiss Higgins's claims under the ADEA and for wrongful discharge, arguing that Plaintiff has failed to allege but-for causation by alleging a contradictory theory for her termination—Defendants' intent to deprive her of the value of her Phantom Units.  (*See* Mot. Dismiss FAC 2.)

(1)    Flachs

101.  As Flachs argues, "North Carolina does not recognize a claim against a supervisor sued in an individual capacity for wrongful discharge in violation of public policy."  *Parker v. Owens*, No. 3:17-cv-00720-MOC-DSC, 2018 U.S. Dist. LEXIS 38191, at *5 (W.D.N.C. Mar. 8, 2018) (citing *Cox v. Indian Head Indus., Inc.*, 187 F.R.D. 531, 536 (W.D.N.C. 1999)); *see Lorbacher v. Hous. Auth.*, 127 N.C. App. 663, 671, 493 S.E.2d 74, 79 (1997) (affirming dismissal of wrongful discharge claims against individual defendants "as they were not plaintiff's employers for the purposes of a wrongful discharge claim"); *Sides*, 74 N.C. App. at 343, 328 S.E.2d at 827

(dismissing wrongful discharge claim against individual defendants as plaintiff's employment contract was with the corporate defendant, not her supervisors). Plaintiff's wrongful discharge claim against Flachs shall therefore be dismissed on this basis.

(2)    Synergy Defendants

102.    Defendants argue that Higgins's ADEA claim must be dismissed because "Higgins's allegation that Synergy [Solutions] fired her to prevent her from realizing the value of her Phantom Units forecloses the conclusion that age was a 'but-for cause' for her termination." (Br. Supp. Mot. Dismiss 30; *see* FAC ¶ 38 (alleging that Higgins was terminated "in whole or in part, in pursuit of a plan and scheme to deprive Higgins of the value of her Phantom Units and thereby avoid a payout to Higgins[.]").) At the pleading stage, the Court concludes that Plaintiff's inconsistent allegations in support of alternative claims are not fatal to her ADEA claim.[5]

103.    An ADEA plaintiff must ultimately prove that age discrimination was the but-for cause of her termination to prevail. *See, e.g.*, *Gross*, 557 U.S. at 176 (stating that a claimant is required to "prove that age was the 'but-for' cause of the employer's adverse decision" in order to prevail on an ADEA claim); *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991) ("[A] plaintiff must prove, with reasonable probability, that but for the age of the plaintiff, the employment decision adverse to the plaintiff would not have been made. Age must have been a determining factor."). However,

---

[5] Although Plaintiff's ADEA claim is under federal law, the survival of that claim is determined under North Carolina's Rule 12(b)(6). Nevertheless, federal cases deciding ADEA claims are persuasive to the Court's analysis, especially given the absence of North Carolina case law deciding such claims.

but-for causation does not mean sole causation, *Arthur v. Pet Dairy*, 593 F. App'x 211, 220 (4th Cir. 2015), and several federal courts have concluded that the ultimate but-for causation requirement "does not in any way limit a plaintiff's ability to plead alternative facts and alternative theories[,]" *Collins v. Fulton Cty. Sch. Dist.*, No. 1:12-CV-1299-ODE-JSA, 2012 U.S. Dist. LEXIS 187392, at *49–50 (N.D. Ga. Dec. 26, 2012) (quoting *Pearson v. Lawrence Med. Ctr.*, No. 5:21-cv-1064-CLS, 2012 U.S. Dist. LEXIS 152595, at *15 (N.D. Ala. Oct. 24, 2012)); *see Renfrow v. Sanborn Map Co.*, No. 4:10CV02295JCH, 2011 U.S. Dist. LEXIS 30240, at *10 (E.D. Mo. Mar. 23, 2011) (same (citation omitted)); *Ries v. Winona Cty.*, No. 10-1715 (JNE/JJK), 2010 U.S. Dist. LEXIS 90914, at *30–31 (D. Minn. July 28, 2010) (same); *Belcher v. Serv. Corp. Int'l*, No. 2:07-CV-285, 2009 U.S. Dist. LEXIS 102611, at *8 (E.D. Tenn. Nov. 4, 2009) (allowing both age and gender discrimination claims to survive pleading stage because the court did "not read [but-for causation requirement] as taking away a litigant's right to plead alternative theories under the Federal Rules").

104. Thus, that Higgins alleges inconsistent reasons for her termination is not dispositive of her claim under federal pleading standards. *See Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 220 (4th Cir. 2013) (reversing dismissal of termination claim because though there were "allegations in [the plaintiff]'s complaint that cut against her claim to relief . . . [,] they d[id] not foreclose her claim to relief at th[e 12(b)(6)] stage of the proceedings"); *Craddock v. Lincoln Nat'l Life Ins. Co.*, 533 F. App'x 333, 334, 336 (4th Cir. 2013) (holding ADEA claim should survive 12(b)(6) dismissal where plaintiff alleged her new manager "embarked . . . on a strategy and scheme to bring

about [her] discharge . . . on the basis of either her disability or her age, or both[,]" because the inference that defendant terminated plaintiff because of age could "be reasonably drawn from the facts alleged"); *Ray v. Amelia Cty. Sheriff's Office*, 302 F. App'x 209, 211–12 (4th Cir. 2008) (vacating lower court's dismissal of ADEA claim where plaintiff alleged several possible reasons for termination because "the inclusion of those stated reasons in [the] complaint d[id] not establish at the pleading stage that [plaintiff wa]s not entitled to relief on her stated discrimination claim" (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002))).

105. These federal decisions are not inconsistent with North Carolina law because our state courts recognize that, "[i]n general, alternative claims may be asserted in the same action[.]" *In re Se. Eye Ctr.-Pending Matters*, 2019 NCBC LEXIS 29, at *107 (N.C. Super. Ct. May 7, 2019) (citing *James River Equip., Inc. v. Mecklenburg Utils., Inc.*, 179 N.C. App. 414, 419, 634 S.E.2d 557, 560 (2006) (explaining that the rules "permit pleading in the alternative and that theories may be pursued in the complaint even if plaintiff may not ultimately be able to prevail on both" (internal quotation marks omitted))); *see* N.C. R. Civ. P. 8(e)(2) ("A party may . . . state as many separate claims or defenses as he has *regardless of consistency*[.]" (emphasis added)). Thus, the Court concludes that Higgins's assertion of inconsistent facts in support of alternative claims for relief does not require dismissal of her ADEA claim under North Carolina's Rule 12(b)(6).

106. That said, Defendants further contend that Higgins has failed to allege facts to support the causal element of her ADEA claim, requiring dismissal. Specifically,

Defendants argue that Higgins acknowledged that she was terminated for poor performance in her First Amended Complaint, which defeats her claim, (Br. Supp. Mot. Dismiss 7 (citing FAC ¶¶ 31, 34–35)), and that she advances only conclusory allegations of a "pattern of discrimination[,]" which is also a fatal deficiency, (Br. Supp. Mot. Dismiss 31).

107. Unlike federal law, North Carolina retains notice pleading, *see Plasman v. Decca Furniture (USA), Inc.*, 257 N.C. App. 684, 689, 811 S.E.2d 616, 621 (2018) (noting that North Carolina is a "notice pleading" state), a lower pleading standard than the plausibility standard used by the federal courts, *see Fox v. Johnson*, 243 N.C. App. 274, 286, 777 S.E.2d 314, 323 (2015) ("[T]he higher federal plausibility pleading standard differs from [North Carolina's] notice pleading standard[.]"). Under notice pleading, "pleadings should be construed liberally and are sufficient if they give notice of the events and transactions and allow the adverse party to understand the nature of the claim and to prepare for trial." *Estate of Savino v. Charlotte-Mecklenburg Hosp. Auth.*, 822 S.E.2d 565, 572 (N.C. Ct. App. 2018) (quoting *Haynie v. Cobb*, 207 N.C. App. 143, 148–49, 698 S.E.2d 194, 198 (2010)); *see Swierkiewicz*, 534 U.S. at 514–15 (" 'It may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test [under notice pleading].' " (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974))).[6]

---

[6] "[T]he policy behind notice pleading is to resolve controversies on the merits, after an opportunity for discovery, instead of resolving them based on the technicalities of pleading." *Ellison v. Ramos*, 130 N.C. App. 389, 395, 502 S.E.2d 891, 895 (1998); *see Sides*, 74 N.C. App. at 347, 328 S.E.2d at 829 ("If [a] plaintiff can prove her allegations[,] the defendants should not be allowed to escape liability because [the] plaintiff's attorneys did not say 'but for.' "). "[A] complaint must nonetheless state enough to give the substantive elements of a legally

108. Given the lack of North Carolina decisions considering ADEA claims under North Carolina's Rule 12(b)(6), a review of decisions under the federal pleading standard is instructive. While the extent to which a plaintiff must plead age-based causal allegations at the pleading stage is less than clear under federal law, *see Shenton v. Aerojet Rocketdyne, Inc.,* No. 3:18-cv-00038, 2018 U.S. Dist. LEXIS 153249, at *8 n.3 (W.D. Va. Sept. 7, 2018) (noting that "[t]he Fourth Circuit has not definitively established this point in a binding published opinion"), federal courts facing this question have generally required a plaintiff, in addition to alleging that she was a member of the protected class at the time of her termination, to plead facts in support of discriminatory motive, the sufficiency of which are assessed on a case by case basis, *see, e.g., Littlejohn v. City of N.Y.,* 795 F.3d 297, 311 (2d Cir. 2015) ("[W]hat must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent."); *Herr v. Am. Kennel Club*, No. 5:17-CV-00547, 2018 U.S. Dist. LEXIS 165524, at *14 (E.D.N.C. Aug. 23, 2018) (dismissing plaintiff's claim where there was "no indication that age played any role in [the defendant's] decision, let alone that it was the but-for cause of his termination"); *Tate v. Auto Truck Transp. USA, LLC*, No. 3:17-cv-00296-RJC-DSC, 2018 U.S. Dist. LEXIS 138003, at *10 (W.D.N.C. Aug. 15, 2018) (dismissing ADEA

---

recognized claim or it may be dismissed under Rule 12(b)(6)." *Lamb v. Styles*, 824 S.E.2d 170, 174 (N.C. Ct. App. 2019) (quoting *Raritan River Steel Co.*, 322 N.C. at 205, 367 S.E.2d at 612).

claim for failure to plead facts showing "a nexus between [the supervisor's disparaging] comments and [p]laintiff's age"). *But see Gottesman v. J. H. Batten, Inc.*, 286 F. Supp. 2d 604, 612 (M.D.N.C. 2003) (denying motion to dismiss ADEA claim where plaintiff alleged that he was sixty-one, was terminated because of his age, and was replaced by a significantly younger employee because "whether or not [a p]laintiff is able to support his claim with evidence of discriminatory motive is more suitable for summary judgment").

109. Here, Higgins alleges that, at age fifty, she was terminated "in whole or in part because of her age," (FAC ¶¶ 36, 115, 120), supported by the following alleged facts: (i) on June 30, 2016, during her last performance review before her termination, she was told she had " 'strong knowledge' in her areas of responsibility [and] '[was] respected by [the Synergy Defendants'] carrier partners and reinsurance carriers which g[ave] them confidence in [Synergy Solutions,]' " and Flachs "also acknowledged her productivity and successful management[,]" (FAC ¶ 27); (ii) in May 2017, "without any advance notice or prior discussion," she was demoted and two managers with less experience were placed between Flachs and Higgins in the chain-of-command, (FAC ¶ 31); (iii) the stated reason for her termination in July 2017 was so that the new managers could "get done what they need[ed] to do[,]" and because Higgins would be "in the way[,]" (FAC ¶ 35); (iv) her termination letter stated that her work performance did not meet Synergy Solutions's standards without further explanation, (FAC ¶ 35); and (v) her job responsibilities were assigned to a thirty-nine-year-old employee, (FAC ¶ 35). More broadly, Higgins further alleges that

Defendants terminated six employees supposedly for cost reductions, three of whom, "including Higgins, were fifty years of age or older and two were approximately forty years of age." (FAC ¶ 36.) Higgins avers that these terminations "were a part of a pattern of termination or forced resignation of [Synergy Solutions's] older employees which had been effected in the five years leading up to Higgins'[s] termination." (FAC ¶ 36.)

110. Viewing the First Amended Complaint in the light most favorable to Plaintiff, the Court concludes that these allegations are sufficient to permit her ADEA claim, and thus her wrongful discharge claim against the Synergy Defendants, to survive dismissal under North Carolina's Rule 12(b)(6).[7] *See Swierkiewicz*, 534 U.S. at 514 (holding, under notice pleading, that plaintiff sufficiently alleged ADEA termination claim because complaint needed only to satisfy the requirements of notice pleading and petitioner had done so by stating "that he had been terminated on account of his . . . age [and by] detail[ing] the events leading to his termination, provid[ing] relevant dates, and includ[ing] the ages . . . of at least some of the relevant persons involved with his termination").

---

[7] As a matter of federal pleading, whether an employee was meeting an employer's legitimate and reasonable expectations at the time of discharge and whether an employer's stated reason for termination was pretextual are generally inappropriate for resolution at the 12(b)(6) stage. *See Craddock*, 533 F. App'x at 335–36 (reversing district court, which dismissed ADEA claim because the allegations affirmatively showed that the plaintiff was not meeting her employer's expectations, because the prima facie elements of an ADEA claim are "not a pleading requirement"); *Blakney v. N.C. A&T State Univ.*, No. 1:17CV874, 2019 U.S. Dist. LEXIS 45794, at *40–41 (M.D.N.C. Mar. 20, 2019) (declining to address whether plaintiff met defendant's reasonable expectations at 12(b)(6) stage). The Court finds these decisions persuasive for purposes of applying North Carolina's Rule 12(b)(6) and concludes that Plaintiff has met her pleading burden on these elements on Defendants' Motion.

H.    Accounting (v. Synergy Defendants, Flachs)

111.    Higgins requests an accounting by Defendants of "the value of Synergy Holdings, the value per share of units of equity ownership in Synergy Holdings, and the value of her Phantom Units and her Class B Units, so as to enable [her] to ascertain the value of her interests in Synergy Holdings." (FAC ¶ 112.)  Defendants move to dismiss Plaintiff's request for an accounting because Higgins has pleaded no basis for it.  (*See* Mot. Dismiss FAC 2.)

112.    "The remedy of an equitable accounting may be available when a plaintiff has asserted a valid claim for relief in equity and an accounting is necessary to compel discovery of information regarding accounts held exclusively by the defendant." *Alkemal Sing. Private Ltd. v. Dew Glob. Fin., LLC*, 2018 NCBC LEXIS 36, at *52–53 (N.C. Super Ct. Apr. 19, 2019) (quoting *Mkt. Choice, Inc. v. New Eng. Coffee Co.*, 5:08-CV-90, 2009 U.S. Dist. LEXIS 73627, at *35–36 (W.D.N.C. Aug. 18, 2009) (applying North Carolina law)).  "An accounting is an equitable remedy, usually sought pursuant to claims of constructive trust or breach of fiduciary duty."  *Starling v. Alexander Place Townhome Ass'n, Inc.*, No. COA09-640, 2010 N.C. App. LEXIS 488, at *10 (N.C. Ct. App. Mar. 16, 2010) (citing *Toomer v. Branch Banking & Tr. Co.,* 171 N.C. App. 58, 70, 614 S.E.2d 328, 337 (2005)).

113.    Because the Court has determined that all claims relating to Phantom Units must be dismissed, and because Higgins has not based any claim on her ownership of Synergy Holdings Class B Units, (*see* FAC ¶¶ 13–15), Plaintiff's accounting claim must also be dismissed, *see Toomer*, 171 N.C. App. at 70, 614 S.E.2d at 337 (affirming

dismissal of accounting claim where underlying claim was also dismissed); *Brown v. Secor*, 2017 NCBC LEXIS 65, at \*17–18 (N.C. Super. Ct. July 28, 2017) (dismissing accounting claim along with underlying claim for declaratory judgment).

V.

CONCLUSION

114. **WHEREFORE**, for the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss as follows:

    a.    The Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's claims for breach of contract, defamation, quantum meruit/unjust enrichment, violation of the NCSA, common law fraud and fraud in the inducement, constructive fraud, negligent misrepresentation, and accounting, and each of those claims is dismissed with prejudice.

    b.    The Court **DENIES** Defendants' Motion to Dismiss Plaintiff's ADEA claim.

    c.    The Court **DENIES** Defendants' Motion to Dismiss Plaintiff's wrongful discharge claim against the Synergy Defendants. The Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's wrongful discharge claim against Flachs and that claim is dismissed with prejudice.

    d.    The Court, in the exercise of its discretion, **DENIES** Plaintiff's request to amend her pleadings for a second time.

**SO ORDERED**, this the 15th day of January, 2020.

/s/ Louis A. Bledsoe, III  
Louis A. Bledsoe, III  
Chief Business Court Judge
